

2007 Decisions

Opinions of the United
States Court of Appeals
for the Third Circuit

3-26-2007

# Lindsey v. Caterpillar Inc

Precedential or Non-Precedential: Precedential

Docket No. 05-4406

Follow this and additional works at: http://digitalcommons.law.villanova.edu/thirdcircuit_2007

Recommended Citation

"Lindsey v. Caterpillar Inc" (2007). *2007 Decisions.* Paper 1376.
http://digitalcommons.law.villanova.edu/thirdcircuit_2007/1376

This decision is brought to you for free and open access by the Opinions of the United States Court of Appeals for the Third Circuit at Villanova
University School of Law Digital Repository. It has been accepted for inclusion in 2007 Decisions by an authorized administrator of Villanova
University School of Law Digital Repository. For more information, please contact Benjamin.Carlson@law.villanova.edu.

**PRECEDENTIAL**

UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT

_____

No. 05-4406

_____


ROSARIO LINDSEY, individually and as
Executrix of the Estate of Charles Lindsey,
Appellant

v.

CATERPILLAR, INC.

_____

On Appeal from the United States District Court
for the District of New Jersey
No. 03-cv-05762
District Judge:  Honorable Garrett E. Brown, Jr., Chief Judge

_____

Argued: June 29, 2006

Before: BARRY, VAN ANTWERPEN, and GIBSON,[*] Circuit Judges.

(Filed:   March 26, 2007)

For Appellant:
Robert G. Bauer
Neil E. Durking (ARGUED)
Abraham, Bauer & Spalding
1600 Market Street, 5th Floor
Philadelphia, PA 19103

For Appellee:

_____

[*]The Honorable John R. Gibson, United States Court of Appeals for the Eighth
Circuit, sitting by designation.

James H. Keale (ARGUED)
Zachery M. Barth
Sedgwick, Detert, Moran & Arnold LLP
Three Gateway Center, 12th Floor
Newark, NJ 07102

_____

OPINION OF THE COURT
_____

JOHN R. GIBSON, Circuit Judge:

Rosario Lindsey, individually and as executrix of the estate of Charles Lindsey, appeals from an order of the District Court granting summary judgment on her claim against Caterpillar arising out of the rollover of a sideboom pipe layer, manufactured by Caterpillar, which resulted in her husband's death. Lindsey alleged that the pipe layer was defective in that it did not have a rollover protective structure. The District Court held that regulations promulgated under the Occupational Safety and Health Act ("the Act" or "the OSH Act") created a federal standard exempting sideboom pipe layers from the requirement for rollover protection, and that these regulations preempt Lindsey's state law product liability claim. Lindsey argues that the savings clause of the Act preserves her claim and, even if preemption is at issue, no conflict exists between the regulation and the state law cause of action. We reverse.

Charles Lindsey suffered his fatal accident while working on a pipeline project in Franklin Township, New Jersey. He was operating a sideboom pipe-laying tractor manufactured by Caterpillar, working in tandem with another tractor to carry a forty-foot

2

section of pipe up a hill. The tractors were traveling in reverse gear, one behind the other, each attached to the same suspended load via its boom rigging. The co-worker's tractor, which was the lower of the two, lost power and began rolling down the hill. As it rolled, it pulled the load and the Caterpillar tractor along with it. The Caterpillar tractor flipped over, fatally crushing Charles Lindsey. The Caterpillar tractor was not equipped with a rollover protective structure, which could have prevented Charles from being crushed.

Lindsey's expert witness, a former designer of heavy industrial equipment for Allis-Chalmers, opined that it was technologically and economically feasible for the Caterpillar pipe layer to have been equipped with a rollover protective structure. This opinion was based in part on the fact that Caterpillar had designed a rollover protective structure for the tractor model at issue, and that Caterpillar provided such structures on later versions for about one percent of the machine's base cost. Allis-Chalmers, one of Caterpillar's competitors, was providing such structures on its sideboom pipe layers at the time Charles Lindsey's pipe layer was manufactured.

## I.

In 1972, the Secretary of Labor published regulations pursuant to the Occupational Safety and Health Act concerning rollover protective structures for material handling equipment. "The design objective [of the regulations] shall be to minimize the likelihood of a complete overturn and thereby minimize the possibility of the operator being crushed as a result of a rollover or upset." 29 C.F.R. § 1926.1000(c)(2)(i). The regulations exclude sideboom pipelaying tractors from this mandate in a single sentence: "This

3

requirement [to equip material handling equipment with rollover protective structures] does not apply to sideboom pipelaying tractors." Id. § 1926.1000(a)(1).

In the agency report to Charles Lindsey's employer following the accident, the Occupational Safety and Health Administration Area Director recognized that pipe layers are exempted from the requirement for rollover protective structures. However, in the recommendations that concluded the letter, the Director wrote that the agency "encourage[d the] use of those limited sideboom pipe layer models which do feature Rollover Protective Structures." In 1998, four years before Lindsey's death, Caterpillar began offering such structures as an option on three of its sideboom pipe layer models.

Rosario Lindsey brought a complaint in three counts against Caterpillar and Midwestern Manufacturing Company, the manufacturer of the pipe layer operated by Charles Lindsey's co-worker. Lindsey later stipulated to a dismissal of all counts against Midwestern Manufacturing Company. Caterpillar moved for summary judgment on the product liability claim on the basis that Lindsey's cause of action for defective design was preempted by the Act, and on the negligence and breach of warranty claims as being precluded by the New Jersey Products Liability Act, N.J. Stat. Ann. §§ 2A:58C-1 to 58C-11.

The District Court concluded that neither the Act nor the regulations promulgated thereunder preempted Lindsey's product liability claim against Caterpillar through express or field preemption, but that 29 C.F.R. § 1629.1000 creates a federal standard concerning a rollover protective structure which is in actual conflict with the state law

4

claim. The District Court further concluded (and Lindsey had conceded) that the negligence and breach of warranty claims are precluded as a matter of state law. Lindsey appeals the District Court's Order and Judgment as to her product liability claim.

## II.

Lindsey argues that the District Court erred as a matter of law in granting summary judgment on the basis that regulations promulgated under the Act preempt her tort law cause of action. She asserts that the Act regulates only the employer-employee relationship and does not apply to manufacturers of defective products, and that the Act's savings clause, 29 U.S.C. § 653(b)(4), operates to save state tort causes of action from preemption. Our review of the District Court's grant of summary judgment is plenary, and we review the facts in the light most favorable to the party against whom the order was entered. Coolspring Stone Supply, Inc. v. Am. States Life Ins. Co., 10 F.3d 144, 146 (3d Cir. 1993).

## A.

Preemption may arise in one of three ways. First, courts will find express preemption if Congress has defined explicitly the extent to which a statute preempts state law. Second, in the absence of explicit statutory language, state law is subject to field preemption if it regulates conduct in a field that Congress intended the federal government to occupy exclusively. Finally, state law is preempted to the extent it actually conflicts with federal law. English v. Gen. Elec. Co., 496 U.S. 72, 78-79 (1990). Actual conflict arises when it is impossible to comply with both the federal and state laws

5

or when the state law stands as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress. Id. at 79.

We are mindful that the touchstone of preemption analysis is congressional purpose, which includes a relevant understanding of the structure and purpose of the statute as a whole. Medtronic, Inc. v. Lohr, 518 U.S. 470, 485-86 (1996). A federal agency may explicitly preempt state law through its regulations so long as the agency acts within its congressionally-delegated authority. Fid. Fed. Sav. & Loan Ass'n v. De la Cuesta, 458 U.S. 141, 153-54 (1982).

Congress passed the Occupational Safety and Health Act in 1970 with the declared purpose "to assure so far as possible every working man and woman in the Nation safe and healthful working conditions and to preserve our human resources." 29 U.S.C. § 651(b). One of the means to this end was "authorizing the Secretary of Labor to set mandatory occupational safety and health standards applicable to businesses affecting interstate commerce." Id. § 651(b)(3). Through this legislation, the federal government entered into a field that traditionally had been occupied by the states. Gade v. Nat'l Solid Wastes Mgmt. Ass'n, 505 U.S. 88, 96 (1992). The federal entry was not uniform or comprehensive, however, as the statute also provided that states could submit to the Secretary of Labor their own occupational safety and health standards to supplant the federal standards. 29 U.S.C. § 667(b). Moreover, the statute reserved to the states the power to enact occupational safety and health laws in areas in which no federal standard exists. Id. at § 667(a). Although the Act contains no express preemption provision, the

6

Supreme Court has determined that the provisions of § 667 preclude "any state regulation of an occupational safety or health issue with respect to which a federal standard has been established, unless a state plan has been submitted and approved." Gade, 505 U.S. at 102.

In contrast, the statute contains a clearly articulated savings clause. The Act is not to be construed "to supersede or in any manner affect any workmen's compensation law or to enlarge or diminish or affect in any other manner the common law or statutory rights, duties, or liabilities of employers and employees under any law with respect to injuries, diseases, or death of employees arising out of, or in the course of, employment." 29 U.S.C. § 653(b)(4). State law claims that fall within the scope of this savings clause are not preempted.

B.

Lindsey argues that the savings clause applies and allows her to prosecute her tort claim under the New Jersey Products Liability Act. She asserts that the OSH Act, whose purpose is to promote workplace safety by regulating employer and employee conduct, is prophylactic in nature. When a workplace injury does occur, Lindsey argues that nothing in the OSH Act prevents the injured worker from seeking compensation under state law, and the savings clause specifically preserves an injured worker's right to tort recovery. Lindsey made these same arguments in response to Caterpillar's summary judgment motion.

1.

In its memorandum opinion granting summary judgment, the District Court

7

adopted the reasoning set forth by the New Jersey Supreme Court in <u>Gonzalez v. Ideal Tile Importing Co.</u>, 877 A.2d 1247 (N.J. 2005), <u>cert. denied</u>, 126 S. Ct. 1042 (2006), which addressed the issue of whether the Act may preempt tort claims against a forklift manufacturer whose product was in compliance with agency standards for warning devices. <u>Gonzalez</u> concluded that the interplay between the Act's savings and preemption clauses means that state tort actions are not expressly preempted and that field preemption is inapplicable because Congress intended to allow states to have some role in maintaining safe and healthful working conditions. 877 A.2d at 1250-51. However, the New Jersey Supreme Court found that the plaintiff's common law tort action conflicted with OSHA's warning device standards because the warning device that the plaintiff was urging could actually create additional dangers in the workplace rather than promote safety. <u>Id.</u> at 1253. <u>Gonzalez</u> did not discuss the savings clause. Similarly, the district court provided no analysis of the savings clause in this case or whether Lindsey's cause of action falls within it.

We do not read the <u>Gonzalez</u> case as instructive to the facts before us. We are examining the effect of OSHA's regulation concerning rollover protection on Lindsey's claim that the Caterpillar pipe layer her husband was operating was defective because it had no such protective device. The applicable regulation sets forth the requirements for rollover protective structures for material handling equipment, but it exempts sideboom pipe layers from having to be equipped with such devices. In other words, the regulation neither requires nor forbids pipe layers to be operated with rollover protection.

8

In contrast, the regulation in <u>Gonzalez</u> contained two standards for warning devices on forklifts. The first required that forklifts be equipped with an operator controlled horn. The second allowed other devices to be installed at the operator's request so long as the device was suitable for the intended area of use. <u>Id.</u> at 1252. The agency interpreted the second standard as forbidding any other device that would create more dangers than it would prevent. The Court thus interpreted the standards as not "merely set[ting] a mandatory minimum for forklift safety devices, but regulat[ing] the universe of warning devices," <u>id.</u> at 1252-53, and concluded that the plaintiff's claim for damages was preempted because the other warning devices he urged "actually may tend to create additional dangers in the workplace." <u>Id.</u> at 1253. The New Jersey Supreme Court was careful to point out that its holding was a narrow one, however, by twice mentioning that not all third-party tort claims are preempted by the OSH Act. <u>Id.</u> at 1249 ("[S]ome third-party claims arising in the workplace may not be preempted by OSHA."); <u>id.</u> at 1253 ("Although a state tort action involving a third party and a work place injury could survive an OSHA conflict analysis, this one simply does not.").

OSHA's rollover protection regulation cannot be read as regulating the universe of protective structures for sideboom pipe layers. We therefore analyze Lindsey's savings clause argument, an issue on which the <u>Gonzalez</u> case is silent.

2.

The Court in <u>Gonzalez</u> granted considerable deference to the agency's lengthy interpretation of its own warning device standards. <u>Id.</u> at 1252 & n.2 (citing <u>Geier v. Am.</u>

9

Honda Motor Co., Inc., 529 U.S. 861, 883 (2000)).  No agency interpretation exists with respect to pipe layers being exempted from the regulatory requirement for rollover protective structures.  The legislative history of the Act does contain a letter sent by the Solicitor of Labor to the Chairman of a House Subcommittee as that body was considering the bill that had come from the executive branch.  The letter specifically addressed the savings clause and provides an indication of the Department of Labor's interpretation.

> The provisions of S.2788, the Administration's proposed Occupational Safety and Health Act of 1969[,] would in no way affect the present status of the law with regard to workmen's compensation legislation or private tort actions.

Occupational Safety and Health Act of 1969: Hearings on H.R. 843, H.R. 3809, H.R. 4294 and H.R. 13373 before the Select Subcomm. on Education and Labor, 91st Cong.1592-93 (1969) (letter of L.H. Silberman, Solicitor of Labor), quoted in Pratico v. Portland Terminal Co., 783 F.2d 255, 266 (1st Cir. 1985).

This agency statement is consistent with the Act's stated purpose, which is to promote safe and healthful working conditions and preserve human resources.  29 U.S.C. § 651(b).  The Act is limited in scope, however, as jurisdiction under the Act extends only to the employee-employer relationship within the workplace.  Id. § 654.  The regulatory language exempting sideboom pipe layers from the requirement for rollover protective structures cannot reach beyond the authority Congress granted.  Therefore, the absence of a requirement for an employer does not implicate third-party duties for a manufacturer.

10

"[A]n agency literally has no power to act, let alone pre-empt the validly enacted legislation [or common law] of a sovereign State, unless and until Congress confers power upon it. . . .  An agency may not confer power upon itself." Louisiana Pub. Serv. Comm'n v. F.C.C., 476 U.S. 355, 374 (1986).

The Act has been described as a "dynamic purpose" statute that does not foreclose the evolution of state laws concerning occupational health and safety.

> Both the language and the legislative history of the OSH Act reflect its "dynamic" character.  Given its language, history and interpretational ambiguity, the OSH Act should be interpreted in a manner that prevents the interference with states' exercise of police powers to protect their citizens. The OSH Act's language indicates a course of regulatory changes as new technology or economic developments or discovery of harmful effects makes a greater degree of workplace protection "feasible."  The concept of a static level of regulation is rejected by the text of the OSH Act, which claims as its purpose "to assure so far as possible every working man and woman in the Nation safe and healthful working conditions and to preserve our human resources."  In addition, the OSH Act does not reflect a congressional intent for national uniformity, and, as noted by Justice Souter in the Gade [v. National Solid Wastes Management Ass'n, 505 U.S. 88 (1992),] dissent, the field of worker protection has traditionally been a state regulated field.

Jose L. Fernandez, Dynamic Statutory Interpretation: Occupational Safety and Health Act Preemption and State Environmental Regulation, 22 Fla. St. U. L. Rev. 75, 114 (1994). The savings clause prevents the Act from diminishing employees' common law rights and duties with respect to injury and death arising out of or in the course of employment.  29 U.S.C. § 653(b)(4).  As such, the clause "assumes that there are some significant number of common-law liability cases to save." Geier v. Am. Honda Motor Co., Inc., 529 U.S. 861, 868 (2000).

11

The Act's savings clause means that a regulation that neither requires nor forbids workplace equipment to have a protective structure cannot stand as a preemptive force against an employee's right to recover against a third-party manufacturer of that product for defective design. We join with those courts whose holdings have formed a "solid consensus that [29 U.S.C. § 653(b)(4)] operates to save state tort rules from preemption." Pedraza v. Shell Oil Co., 942 F.2d 48, 53 (1st Cir. 1991) (citing cases and law review notes); see also Sakellaridis v. Polar Air Cargo, Inc., 104 F. Supp. 2d 160, 163-64 (E.D.N.Y. 2000) ("The savings clause plainly states that workers' statutory remedies for personal injuries are preserved. It is not consequential that the standard of care is prescribed by the common law, a separate statutory scheme, or an administrative scheme."); York v. Union Carbide Corp., 586 N.E. 2d 861, 865-66 (Ind. Ct. App. 1992) ("[W]e agree with the Pedraza court's holding that the savings clause operates to exempt tort law claims from preemption.").

3.

Caterpillar argues that this case is controlled by the Supreme Court's conflict preemption analysis in Geier v. American Honda Motor Co., Inc., 529 U.S. 861 (2000), which it asserts should result in Lindsey's theory of liability being preempted in spite of the Act's savings clause. Geier held that the savings clause of the National Traffic and Motor Vehicle Safety Act of 1966 did not bar the application of conflict preemption analysis to a defective design claim against an automobile manufacturer. Id. at 869. A 1984 Federal Motor Vehicle Safety Standard, promulgated under the 1966 Act, called for

12

the gradual phasing in of passive restraint systems in automobiles. Id. at 878-79. Geier was injured when her 1987 vehicle was involved in a collision. She filed suit alleging that the manufacturer was negligent for failing to install driver's side airbags. Although the Safety Standards called for some 1987 automobiles to be equipped with driver's side airbags, the vehicle Geier was driving was not among them and was in compliance with the standards. Id. at 864-65.

The 1966 Act's preemption provision precluded states from establishing safety standards for vehicles that were not identical to the applicable federal standard. Id. at 867. The savings clause stated that "[c]ompliance with any Federal motor vehicle safety standard issued under this subchapter does not exempt any person from any liability under common law." 15 U.S.C. §1397(k) (1988). The Court held that the savings clause removed tort actions from the scope of express preemption analysis, but found "[n]othing in the language of the savings clause [that] suggests an intent to save state-law tort actions that conflict with federal regulations." Geier, 529 U.S. at 869. Rather, the savings clause "simply bar[s] a special kind of defense, namely, a defense that compliance with a federal standard automatically exempts a defendant from state law, whether the Federal Government meant that standard to be an absolute requirement or only a minimum one." Id.

Justice Breyer relied heavily on the history of the Federal Motor Vehicle Safety Standard at issue to explain why it preempted the state tort action in Geier. He recited seven significant considerations that the Department of Transportation had articulated in

13

explaining the standard, which included balancing safety concerns against cost considerations and anticipated consumer compliance. Id. at 877-78. The Department allowed manufacturers some choice in the passive restraint systems they were to install to "help develop data on comparative effectiveness, . . . allow the industry time to overcome the safety problems and the high production costs associated with airbags, and . . . facilitate the development of alternative, cheaper, and safer passive restraint systems." Id. at 879. Consistent with these goals, the Standard called for a phase-in of passive restraints over four years. The vehicle the plaintiff drove was manufactured in the first year of the phase-in period when only ten percent of a manufacturer's fleet was to be equipped with passive restraint systems. Id. at 865, 879. The Court held, based on the language of the Standard and the agency's explanation, that the Standard "sought a gradually developing mix of alternative passive restraint devices for safety-related reasons" and the plaintiff's lawsuit "would stand as an 'obstacle' to the accomplishment of that objective." Id. at 886.

The policy reasons underlying the federal regulation in Geier were more contemporary, detailed, and specific than any purpose that can be attributed to the regulation at issue in this case. It stands to reason, therefore, that the preemption provision and savings clause at issue in Geier are markedly different from the ones that appear in the OSH Act. Here, the pertinent language directs that the Act cannot diminish the common law or statutory rights of employees under any law with respect to their injuries or death that arise out of, or in the course of, their employment. 29 U.S.C. §

653(b)(4). In contrast, the savings clause in <u>Geier</u> did not mention a litigant's ability to bring a state tort action. <u>Geier</u> does not compel a conclusion that the savings clause in this case cannot foreclose further preemption analysis.

Caterpillar also argues that the District Court's order should be affirmed because it correctly applies the holding of <u>Gade v. National Solid Wastes Management Ass'n</u>, 505 U.S. 88 (1992), that state and OSHA workplace safety standards on a single issue cannot coexist. <u>Gade</u> addressed the preemptive effect of safety standards contained in federal hazardous waste regulations on an Illinois licensing statute that mandated 500 days of field experience for certain workers, when those same workers needed only three days of experience under the OSHA regulations. <u>Id.</u> at 92-93. The justices split into three groups on the issue: four concluded that the Illinois statute was in actual conflict with the federal standards, <u>id.</u> at 96-104 (O'Connor, White, and Scalia, JJ., and Rehnquist, C.J.); one justice read the federal standards as expressly preempting the state law, <u>id.</u> at 109-14 (Kennedy, J.); and four justices found no preemption, <u>id.</u> at 114-22 (Souter, Blackmun, Stevens, and Thomas, JJ.). Five justices agreed that the "key question" in the case was "at what point the state regulation sufficiently interferes with federal regulation that it should be deemed pre-empted under the Act." <u>Id.</u> at 107. The Court provided an answer:

> In the decision below, the Court of Appeals relied on <u>English [v. General Electric Co.</u>, 496 U.S. 72 (1990),] to hold that, in the absence of the approval of the Secretary [of Labor], the OSH Act pre-empts all state law that "constitutes, in a direct, clear and substantial way, regulation of worker health and safety." We agree that this is the appropriate standard for determining OSH Act pre-emption. On the other hand, state laws of general applicability (such as laws regarding traffic safety or fire safety) that do not

15

> conflict with OSHA standards and that regulate the conduct of workers and nonworkers alike would generally not be pre-empted. Although some laws of general applicability may have a "direct and substantial" effect on worker safety, they cannot fairly be characterized as "occupational" standards, because they regulate workers simply as members of the general public. In this case, we agree with the court below that a law directed at workplace safety is not saved from pre-emption simply because the State can demonstrate some additional effect outside of the workplace.

Id. (citation omitted). We conclude that the difference between Lindsey's state products liability action and the legislated state standard in Gade is critical. Here, Lindsey is seeking to hold Caterpillar accountable under a state law of general applicability that applies equally to workers and non-workers. She has standing to bring the action as a member of the general public, not because the decedent was an employee of an employer covered by the OSH Act. In contrast, the Illinois statute applied only to employees who were also covered by the OSH Act, thereby adding a layer of safety directives in addition to those imposed by the federal standards.

Moreover, the Act's savings clause was virtually irrelevant in Gade, where the state law at issue was a positive enactment setting occupational standards. Here, the New Jersey Products Liability Act fits squarely within those actions protected by the savings clause from "enlarg[ing] or diminish[ing] or affect[ing] in any other manner the common law or statutory rights [and] duties . . . of employees under any law with respect to injuries [or] death of employees arising out of, or in the course of, employment." 29 U.S.C. § 653(b)(4). Using the analysis of Gade, the facts of this case do not support preemption.

16

We hold that Lindsey's personal injury cause of action falls within the scope of the OSH Act's savings clause, 29 U.S.C. § 653(b)(4), because it asserts her rights under New Jersey law with respect to her husband's death.

C.

Although we have concluded that, under the circumstances of this case, the Act's savings clause effectively halts further preemption analysis, the result would be the same if we were to decide this case on the preemption theory advanced by Caterpillar and adopted by the District Court. The District Court found that the OSHA regulations established a federal standard which imposes no requirement for manufacturers to install rollover protection structures on sideboom pipe layers, and that allowing Lindsey's contention that the Caterpillar machine was defectively designed would subject the manufacturer to a standard that is in direct conflict with the federal standard.

We reject this analysis. The rollover protection structure regulation merely exempts sideboom pipe layers from the requirement for rollover protection. The Occupational Safety and Health Administration offered no explanation for the exemption at the time of the regulation's enactment, and the agency has remained silent on the issue during the intervening thirty years. The OSH Act, under which these regulations were promulgated, has a stated purpose of promoting the health and safety of workers in the workplace. To that end, the agency investigated the accident which resulted in Charles Lindsey's death and recommended steps to be taken to eliminate or reduce the danger of further incidents. In his report following the investigation, the agency's area director

17

encouraged the employer to use sideboom pipe layer models which do feature rollover protective structures. No conflict exists in this case between the regulation and a private tort cause of action asserted on behalf of a worker who might have avoided a fatal accident had the protective device been in place. Several factors compel our conclusion: 1) the Act's clear legislative intent is the assurance of workers' safety and health; 2) the regulation is one that excludes but does not forbid a protective device; and 3) the agency recommends that workers be afforded that protective device.

## III.

We hold that Lindsey's claim for defective equipment brought under the New Jersey Products Liability Act against the manufacturer is an action to enforce "the common law or statutory rights . . . of employees . . . with respect to injuries . . . or death of employees arising out of, or in the course of, employment." 29 U.S.C. § 653(b)(4). We will reverse the judgment of the District Court and remand for further proceedings consistent with this opinion.

_____

18