

2007 Decisions

Opinions of the United
States Court of Appeals
for the Third Circuit

7-2-2007

# Coulton v. Univ PA

Precedential or Non-Precedential: Non-Precedential

Docket No. 06-2417

Follow this and additional works at: http://digitalcommons.law.villanova.edu/thirdcircuit_2007

Recommended Citation

"Coulton v. Univ PA" (2007). *2007 Decisions.* Paper 822.
http://digitalcommons.law.villanova.edu/thirdcircuit_2007/822

This decision is brought to you for free and open access by the Opinions of the United States Court of Appeals for the Third Circuit at Villanova
University School of Law Digital Repository. It has been accepted for inclusion in 2007 Decisions by an authorized administrator of Villanova
University School of Law Digital Repository. For more information, please contact Benjamin.Carlson@law.villanova.edu.

**NOT PRECEDENTIAL**

UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT
_____

No. 06-2417
_____

MICHAEL COULTON,

Appellant,

v.

UNIVERSITY OF PENNSYLVANIA

_____

On Appeal from the United States District Court
for the Eastern District of Pennsylvania
(Civil No. 05-cv-01446)
District Judge: Hon. John R. Padova

Submitted Under Third Circuit LAR 34.1(a)
May 22, 2007

Before: BARRY, CHAGARES, and TASHIMA,[1] Circuit Judges.

_____

(Filed July 2, 2007)

OPINION OF THE COURT

---

[1]The Honorable A. Wallace Tashima, United States Circuit Judge for the Ninth Circuit Court of Appeals, sitting by designation.

CHAGARES, Circuit Judge.

In this lawsuit alleging "reverse" racial discrimination, plaintiff/appellant Michael Coulton ("Coulton") appeals the District Court's grant of summary judgment to defendant/appellee University of Pennsylvania ("the University"). Because we conclude that Coulton has failed to present evidence from which a reasonable jury could find that Coulton suffered unlawful discrimination, we will affirm.

I.[2]

Coulton is a Caucasian male and former University employee. Coulton received his certification as a laboratory animal technician from the American Association for Laboratory Animal Science ("AALAS") in 1981. As a part of this certification process, Coulton received training governing the proper standards of care of animals used in laboratory research. In particular, Coulton received training on the proper methods of euthanizing laboratory animals. Since 2000, the only two AALAS-approved methods of euthanasia are carbon dioxide poisoning and lethal injection. Before his employment with the University, Coulton worked at six different research facilities, all of which strictly prohibited improper treatment of research animals. The University, like all institutions that conduct animal research, view improper treatment as cause for immediate

_____

[2]Given the procedural posture, we state the facts in the light most favorable to Coulton. See Lindsey v. Caterpillar, Inc., 480 F.3d 202, 205 (3d Cir. 2007) (noting that when reviewing a grant of summary judgment, we must construe the facts "in the light most favorable to the party against whom the order was entered").

2

termination.  See 39A (Coulton's testimony noting the "universal rule" against inhumane treatment of research animals, and that such behavior "will not be tolerated").

A.

In February 1998, Coulton applied for a position as an animal caretaker with the University's Institute of Human Gene Therapy ("the Institute").  Coulton was interviewed and hired by Derrick Dow, an African-American, and began working in April 1998.  As part of his orientation materials at the Institute, Coulton received a copy of the University's policies and procedures, and understood that University policy strictly prohibited the inhumane treatment of animals.  Moreover, Coulton understood that under University policy, the only acceptable methods of euthanizing animals were carbon dioxide poisoning or lethal injection.

Following his hire, Coulton worked in various positions within the Institute.  In September 2003, Coulton was working as a Research Specialist C when the University placed him on probation and advised him that he was at risk for termination unless his job performance improved.  Among the reasons the University placed Coulton on probation were Coulton's failure to show "good judgment in animal husbandry," including "planning to sacrifice valuable mice rather than re-breeding them and exercising poor judgment in choosing when to wean mice."  141A.  The report concluded that overall, Coulton had "not demonstrated the level of skills and independence that we expect in a Research Specialist C."  Id.

During Coulton's probationary period, he began looking for another position within the University. In September 2003, the University Laboratory Animal Resources Department ("ULAR") hired Coulton as a laboratory animal technologist. The decision to hire Coulton was made by Tom Henry, an African-American and the then-manager of ULAR. According to Coulton, prior to the beginning of Coulton's tenure at ULAR, Henry warned him to expect some of his colleagues to call him racially derogatory names because approximately 90% of the ULAR staff was African-American. Nonetheless, Coulton admits that Henry's prediction never came to pass: Coulton admits that no member of the ULAR staff ever directed a racial comment at him, nor can Coulton recall any University employee ever making any racial comment in his presence.

Coulton's immediate supervisor at ULAR was Celestine Campbell, an African-American. Coulton admits that he "never" had any conflicts with Campbell, let alone conflicts that implicated race. 71A-72A. Coulton also admits that Campbell never made any racial comments in his presence.

As the lead laboratory technologist at ULAR, Coulton occasionally served as acting supervisor. When he first assumed supervisory responsibilities, Coulton claims that many of the staff members would not follow his instructions, and complained that he was "bossy." While Coulton claims that two of his African-American co-workers informed him that his supervisory problems were attributable to race, Coulton admits that he never raised these concerns to any of his supervisors. Coulton further admits that after he discussed the insubordination problem with Campbell, she intervened on his behalf

4

and informed the staff that they were required to follow instructions Coulton gave them in his capacity as acting supervisor.

In sum, it is undisputed that at no time during his employment with ULAR did Coulton ever report that he was having problems due to race. Furthermore, it is undisputed that at no time during Coulton's employment did he believe that any of his superiors were discriminating against him.

B.

On September 7, 2004, Campbell was returning from lunch with several ULAR employees. The group was discussing a broken garbage disposal in the ULAR lab, and Campbell jokingly blamed one of the employees, Donta Williams, for causing the problem. Williams replied that he was not responsible for breaking the disposal, but stated that Coulton probably broke the disposal by dropping mice into it. Campbell asked Williams if he was serious; Williams replied that he was.

Following this exchange, Campbell decided that further investigation was warranted, and she called Williams into her office for further questioning. At that time, Williams reiterated that he had seen Coulton drop live mice into the garbage disposal on "numerous" occasions. 168A. After this meeting, Campbell informed Dow of the incidents Williams had reported, and Dow instructed Campbell to have Williams fill out an incident report and make a written statement, which Williams did. Thereafter, Campbell gave the completed incident report, including Williams' statement, to Dow.

5

After learning of the allegations against Coulton, Dow contacted the University's Human Resources Department, and spoke with Susan Curran, a Caucasian and the University's Resources Director for Provost Administrative Affairs. As part of her job duties, Curran was responsible for personnel issues within ULAR. Dow and Curran agreed to conduct a joint investigation of the allegations against Coulton. Dow and Curran met with Williams during the course of their investigation. During their meeting, Williams explained that he had seen Coulton drop live mice into a garbage disposal unit on three different occasions. According to Williams, on one such occasion, Coulton dangled a live mouse, called out "Hey Donta," and then proceeded to drop the live mouse into the garbage disposal. When asked when he had last seen Coulton drop a live mouse into the garbage disposal, Williams stated that the last time that he had seen Coulton do so was approximately two weeks before he had reported the incident to Campbell. Williams further stated that the other two incidents had occurred a few months earlier, but that he could not remember the exact dates.

When asked why he had not reported Coulton's behavior earlier, Williams responded that he had not been trained in the proper methods of euthanasia, and was not aware that Coulton was acting improperly. Williams also noted that because Coulton was

his acting supervisor, he assumed that Coulton's actions were proper.[3] Finally, Willians noted that he had gotten along well with Coulton.

After the meeting with Williams, Dow and Curran checked the euthanasia request logs for the day of the alleged incident, and found no requests completed by Coulton.

Thereafter, Dow and Curran met with Coulton on September 16, 2004. At this meeting, Dow and Curran first inquired whether Coulton got along with other ULAR staff. Coulton replied that he had a problem with an employee named Warner Days, but not with any other employee. Dow and Curran next asked Coulton if he knew the proper procedures to euthanize mice, and Coulton responded that he did, explaining that carbon dioxide poisoning was the appropriate method. Dow and Curran then informed Coulton that another employee had informed them that Coulton had improperly euthanized mice. Coulton does not recall whether he admitted or denied the allegations during the meeting. Immediately thereafter, Coulton changed the subject and began talking about "other things." Dow and Curran both believed that it was strange that Coulton failed to protest his innocence strenuously, ask who made the allegations, or ask for further specifics about the alleged incidents. They do recall that Coulton began talking about another employee who allegedly engaged in similar conduct, and was able to get his job back.

---

[3]Although it is disputed whether Williams was telling the truth with respect to his training and with respect to whether he actually believed Coulton's actions were proper, those disputes are not material.

At the close of the meeting, Dow and Curran informed Coulton that he was being placed on administrative leave pending completion of the investigation, and later sent him a letter explaining the terms of his leave. Coulton concedes that Dow and Curran's decision to place him on administrative leave was both proper and non-discriminatory.

Based on their investigation, Dow and Curran concluded that Coulton had improperly euthanized mice in violation of University policy. Dow and Curran credited the allegations against Coulton because Coulton admitted that he did not have any problem with Williams, because Williams had no reason to make up the allegations, and because of Coulton's failure to address directly the allegations during their meeting with him.

Dow and Curran shared the conclusions of their investigations with Dow's supervisor, Dr. Diane Gaertner, and sought her input on what action was appropriate. Gaertner replied that given the seriousness of the infractions, she believed that Coulton should be terminated. Accordingly, on October 4, 2004, Dow informed Coulton that he was terminated because he had improperly euthanized mice in violation of University policy by placing them into the garbage disposal.

C.

Coulton filed an administrative grievance with the University following his termination, claiming that he had wrongly been terminated on the basis of his race and age. In accordance with University policy, Coulton's grievance was placed on hold pending an investigation into his allegations of discrimination.

8

The Director of the University's Affirmative Action Office, Jeanne Arnold, an African-American, contacted Coulton to discuss his allegations. Thereafter, Arnold assigned the investigation to Patrice Miller, who is Caucasian. Following her investigation, Miller concluded that Coulton's allegations were meritless. Miller sent a letter to Arnold, Gaertner, and Coulton informing them of the results of her investigation. Coulton believed that he would not get a fair investigation from Arnold because "[s]he was black protecting more African-Americans [sic]." 109A.

In January 2005, a grievance panel held a hearing regarding Coulton's termination.[4] Pursuant to University policy, the panel's recommendations are purely advisory: the University President or her designee retains the ultimate decision-making authority, and is free to accept, reject, or modify the panel's recommendation. The panel heard testimony from several witnesses, including Coulton, Dow, and Williams. For his part, Coulton introduced evidence from numerous witnesses attesting to his exemplary treatment of laboratory animals and adherence to University euthanasia policies. The panel unanimously agreed that "[t]here was zero evidence of discrimination against [Coulton]," but also concluded that the investigation that led to Coulton's termination was insufficiently thorough because Dow and Curran failed to interview Coulton's immediate supervisor, Campbell. Moreover, the panel also disagreed that Williams' testimony

---

[4]It is undisputed that the grievance panel hearing was conducted in accordance with University policy.

9

should be credited over Coulton's, given Williams' relatively short tenure at the University relative to Coulton.

D.

The panel's recommendation was forwarded to the University President, who delegated the matter to Joann Mitchell, her Vice President and Chief of Staff, whom she had designated to resolve personnel grievances. Mitchell then began reviewing the panel's recommendation, including an executive summary of the pertinent materials prepared by Curran. This summary included the grievance panel's conclusions and recommendations, and a summary of the investigation Dow and Curran conducted. Additionally, Mitchell reviewed Williams' witness statement made in the initial phase of the investigation, the materials submitted during the grievance proceeding, and a letter from Miller summarizing her investigation into Coulton's claims of discrimination.

In addition to reviewing all of these materials, Mitchell also interviewed Curran at length about her investigation, as well as each of the three active members of the grievance panel to explore their reasons for crediting Coulton over Williams. Following her interviews with the panel members, Mitchell concluded that the panel members' reasoning boiled down to their shared belief that a short-term employee simply was not as credible as a long-term one. Because Mitchell disagreed with this assessment, and because she concluded that the evidence overall supported the conclusion that Coulton had violated ULAR euthanasia policies, she rejected the grievance panel's

10

recommendation and upheld Coulton's termination.  Accordingly, the President rejected the panel's recommendations and upheld Coulton's termination.

Following Coulton's termination, the University hired a Caucasian male, Robert Crean, to replace him.

Thereafter, Coulton filed a lawsuit in District Court alleging age and racial discrimination in violation of 42 U.S.C. § 1981, and the Pennsylvania Human Relations Act, 43 Pa. Stat. § 951, et seq.  ("PHRA").  The University subsequently moved for summary judgment.  By Opinion and Order dated March 21, 2006, the District Court granted the University's motion for summary judgment, holding (i) that Coulton had failed to make out a prima facie case of discrimination; and (ii) that, even if he had done so, his claim would nonetheless fail, because Coulton also failed to carry his burden to show that the University's proffered motive for terminating him -- Coulton's improper euthanasia of laboratory mice -- was pretextual.  This appeal ensued.[5]

## II.

As this is an appeal of a grant of summary judgment, our review is plenary. Atkinson v. Lafayette Coll., 460 F.3d 447, 451 (3d Cir. 2006).  Because Coulton has adduced no direct evidence of discrimination, we must evaluate his § 1981 and his PHRA claims under the familiar burden-shifting framework first articulated by the Supreme Court in McDonnell Douglas Corp. v. Green, 411 U.S. 792, 802 (1973); see also Jones v.

---

[5]Coulton has not pursued his age discrimination claim on appeal; we therefore deem it to be waived.

11

Sch. Dist. of Phila., 198 F.3d 403, 410 (3d Cir. 1999) (applying McDonnell Douglas test to claims brought pursuant to § 1981 and the PHRA).

Under McDonnell Douglas, the plaintiff bears the initial burden of establishing a prima facie case of unlawful discrimination. 411 U.S. at 802. If the plaintiff succeeds, the burden of production shifts to the employer to articulate a legitimate, nondiscriminatory reason for the employee's termination. Id. Once the employer meets its relatively light burden, the burden of production returns to the plaintiff, who must show by a preponderance of the evidence that the employer's proffered reason is pretextual. See id. at 804-05. Accordingly, once an employer has proffered a legitimate, nondiscriminatory reason, the plaintiff "generally must submit evidence which: (1) casts sufficient doubt upon each of the legitimate reasons proffered by the defendant so that a factfinder could reasonably conclude that each reason was a fabrication; or (2) allows the factfinder to infer that discrimination was more likely than not a motivating or determinative cause of the adverse employment action." Fuentes v. Perskie, 32 F.3d 759, 762 (3d Cir. 1994). Because the ultimate issue is whether "discriminatory animus" motivated the employer, it is not enough to show that the employer made a wrong or mistaken decision. Rather, the plaintiff must uncover "weaknesses, implausibilities, inconsistencies, or contradictions" in the employer's explanation that would allow a reasonable factfinder to believe that the employer did not truly act for the asserted reason. Id. at 765.

12

In the usual case, a plaintiff must offer evidence to establish that he is a member of a "protected" (i.e., minority) class. Because Coulton is Caucasian, and therefore not a racial minority, the prima facie case is tweaked slightly, and Coulton must present "sufficient evidence to allow a reasonable fact finder to conclude (given the totality of the circumstances) that the defendant treated plaintiff 'less favorably than others because of his race. . . .'" Iadimarco v. Runyon, 190 F.3d 151, 163 (3d Cir. 1999) (quoting Furnco Constr. Corp. v. Waters, 438 U.S. 567, 577 (1978)). In an effort to meet this "rather modest" burden, Marzano v. Computer Sci. Corp. Inc., 91 F.3d 497, 508 (3d Cir. 1996), Coulton essentially relies on three pieces of evidence.

First, Coulton notes that the initial decision to discharge him was made by an African-American supervisor of a predominantly African-American department (Dow), which was ultimately upheld by an African-American University Vice President (Mitchell). The mere fact that Dow and Mitchell were of a different race than Coulton, however, is insufficient to permit an inference of discrimination. Iadimarco, 190 F.3d at 156 ("Although the race and/or gender of the individual(s) responsible for [an adverse employment] decision is certainly relevant, it is insufficient to establish a prima facie case of discrimination without more."). Under a contrary rule, federal anti-discrimination laws would be implicated every time an employee suffered an adverse employment action at the hands of a supervisor of a different race, religion, sex, national origin, or, conceivably in some cases, age or disability status. By his own admission, Coulton concedes that he has no reason to believe that Mitchell discriminated against him on the basis of race, and

13

was similarly unable to identify any evidence to support his belief that Dow had discriminated against him.

Second, Coulton also places great weight on the comments made to him by Henry prior to his arrival at ULAR predicting that he would suffer problems because he was a white man working in a department in which the overwhelming majority of his co-workers would be African-American. To begin with, Henry's predictions were just that -- predictions; they were not evidence. Moreover, by Coulton's own admission, Henry's predictions were wrong: Coulton concedes that no member of the ULAR staff ever directed a racial comment at him, nor can Coulton recall any University employee ever making any racial comment in his presence. While Henry speculated that racial animus may have played some role in Williams' allegations, he offered no evidence to support this contention.[6] Finally, Henry's prediction of racial animus is undermined by the fact that the person the University hired to replace Coulton was a white male.

The third piece of evidence on which Coulton relies in an effort to establish a prima facie showing of racial discrimination is the fact that the University had treated him less favorably than three similarly situated African-American University employees. More precisely, three ULAR employees -- Warner Days, Paula Lopez, and Gary Felder -- were each accused of animal mistreatment, but ultimately retained their jobs. These

---

[6]There is a good reason for this absence of evidence: Henry retired from ULAR approximately six months before Coulton's termination in March 2004, well prior to any of the alleged incidents that led to Coulton's termination. Thus, any knowledge he might have about events that happened at ULAR that long after his departure would be based on hearsay or pure speculation.

14

disparities, Coulton argues, permit the inference that his termination was not overturned because of his race.  Coulton is wrong on all counts.

Warner Days is an African-American ULAR employee who was terminated for mistreatment of laboratory animals but later reinstated.   For several reasons, Coulton's claim to be similarly situated to Days is unavailing.  As an initial matter, the misconduct for which Days was terminated (while certainly reprehensible) was arguably less serious than Coulton's alleged misconduct, inasmuch as Days' alleged conduct -- squirting bleach on laboratory mice -- may not have led to their death, while Coulton's throwing them down the garbage disposal certainly did.  Even assuming an equivalent seriousness of conduct, however, there was substantial exonerating evidence in Days' case that was not present in Coulton's: eyewitnesses to the incident for which Days was terminated gave oral and written testimony that another employee, not Days, was the wrongdoer.  No such exculpatory eyewitness evidence was present in Coulton's case; to the contrary, the sole eyewitness, Williams, repeatedly affirmed that Coulton did in fact commit the misconduct for which he was terminated.  Third, the ultimate decisionmaker (i.e., the University President's designee) was different in the two cases; there is no record evidence that Mitchell had any involvement in the decision to reinstate Days.  Fourth, in Days' case, the University failed to follow its internal regulations requiring timely processing of Days' administrative grievance.  By contrast, there is not even an allegation (let alone evidence) that the University failed to follow its internal procedures with respect to Coulton's

15

complaint. For this multitude of reasons, the District Court properly determined that Coulton and Days were not similarly situated.

Nor is Coulton similarly situated to Lopez or Felder. Lopez prematurely euthanized several mice prior to the date on which they were scheduled to be euthanized because Lopez misread the dates listed on the animals' cage. It is uncontested that Lopez followed proper procedure in conducting the euthanasia; she was never accused of mistreating the animals. The issue in Lopez's case arose out of the *timing* of the euthanasia, as distinguished from either the fact that the mice were euthanized or the manner in which the euthanasia took place. Accordingly, Lopez and Coulton are not similarly situated.

Felder's situation is similarly distinguishable. There, the infraction stemmed from Felder's failure to change the mice's cages and refill a water bottle -- infractions that are in no way analogous to the conduct in issue in this case. Coulton's claim to have been treated differently than similarly situated African-American ULAR employees is therefore unavailing. Accordingly, we hold that the evidence Coulton adduced is insufficient, either individually or collectively, to carry his burden to make a prima facie showing of racial discrimination.

Even assuming arguendo that Coulton had carried his burden in the initial step of the McDonnell Douglas analysis (which he has not), he has offered no evidence from which a reasonable decisionmaker could conclude that the University's proffered reason for terminating him was pretextual. In this regard, Coulton offers only reasons that the

16

University should not have believed the allegations lodged against him, and lists

purported deficiencies in Mitchell's investigation.[7] But these arguments are beside the

point for our purposes: "pretext is not shown by evidence that the employer's decision

was wrong or mistaken, since the factual dispute at issue is whether discriminatory

animus motivated the employer, not whether the employer is wise, shrewd, prudent, or

competent." Kautz v. Met-Pro Corp., 412 F.3d 463, 467 (3d Cir. 2005) (internal

quotation marks omitted). "The question is not whether the employer made the best, or

even a sound, business decision; it is whether the real reason is discrimination."

Atkinson, 460 F.3d at 454. On that score, the record is completely barren. As noted

previously, Coulton has failed to offer anything other than unsupported speculation that

any decisionmaker took his race into consideration when conducting the investigation or

making the termination decision. Furthermore, the fact that the University hired a white

person to replace him reduces the likelihood that Coulton was terminated on the basis of

his race. See Pivirotto v. Innovative Sys. Inc., 191 F.3d 344, 354 (3d Cir. 1999)

(suggesting that employer's replacement of person complaining of discrimination with

another person within complainant's protected class militates against finding of

discrimination). Accordingly, even had Coulton made out a prima facie case of

discrimination, his claim would fail for the independent reason that he has not offered

---

[7]However, Coulton does admit that if the University decisionmakers believed the allegations against him, it would be reasonable for them to terminate his employment.

17

sufficient evidence to show that the University's proffered reason for terminating him was pretextual.

III.

For the foregoing reasons, we will affirm the decision of the District Court in all respects.