**STEEL INSTITUTE OF NEW YORK, Plaintiff,**

v.

**The CITY OF NEW YORK, Defendant.**

No. 09 civ. 6539 (CM).

United States District Court,
S.D. New York.

Dec. 21, 2011.

---

212. *Id.*

213. *See* Compl. ¶ 204.

Brian A. Wolf, Smith, Currie & Hancock LLP, Fort Lauderdale, FL, James F. But-

ler, III, Smith, Currie & Hancock, LLP, Atlanta, GA, for Plaintiff.

Karen Beth Selvin, Sheryl Rebecca Neufeld, New York City Law Department, New York, NY, Gary Kenneth Stearman, United States Dept. of Labor, Washington, DC, for Defendant.

## MEMORANDUM DECISION AND ORDER DENYING PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT, GRANTING DEFENDANT'S CROSS–MOTION, AND DISMISSING THE COMPLAINT

COLLEEN McKENNA, District Judge.

### INTRODUCTION

Plaintiff Steel Institute of New York ("Plaintiff"), a trade organization with members in the construction industry, asks this Court to declare that certain statutes and regulations enacted and enforced by Defendant City of New York (the "City") and its subdivisions concerning construction cranes are preempted by OSHA regulations. Before the Court are the parties' cross-motions for summary judgment.

For the reasons discussed below, Plaintiff's motion for summary judgment is DENIED, the City's cross-motion is GRANTED and the complaint in this matter is DISMISSED.

### LEGAL AND FACTUAL BACKGROUND[1]

#### A. The City Building Code and Crane Statutes

This case challenges statutes enacted by the City of New York to regulate cranes and derricks used in the construction and demolition of buildings, and regulations promulgated pursuant thereto by the New York City Department of Buildings ("DOB"). *See generally* N.Y. City Admin. Code §§ 28–3316, 28–3319, Reference Standard 19–2 (the "City Statutes").

Prior to the passage of the first New York City Charter in 1897, City building regulation was a matter of State statute. For example, an 1882 Act set forth the rules for the construction of buildings in New York City, and made the City Fire Department responsible for their enforcement. L. 1882 ch. 410 § 471 *et seq.* An

---

1. The parties have failed to comply with the Court's Individual Rules, which require memoranda of law to present a section of facts to be relied on in the argument. Plaintiff instead supplied a "Statement of Material Facts as to Which There is No Issue to Be Tried," and incorporated it by reference in its Brief—a practice I specifically disallow. This is bad enough in itself, but the purported "facts" included therein consist of citations to several hundred pages worth of regulatory material, some of which is not available on websites like Westlaw and Lexis. Nowhere in the submissions are the parties, or their interest in the case, identified. Nor is the course of the litigation in this case mentioned. As for the dozens of regulations, they are simply identified; no indication is given of when they were enacted, when they were revised, or what they were meant to do. This sort of context and narrative is precisely the reason that I require *the parties* to present the operative facts on which they rely, rather than leaving it to me to sift through mountains of evidence and legal materials.

The City, for its part, spends most of its factual submission—also inappropriately incorporated by reference into its Brief—explaining the operation of certain regulations. However, in doing so, it cites to a declaration of its engineer, who, in turn, does not identify the regulations to which he refers! It too fails to identify the parties and the history of their dispute, including the allegations and theory of the complaint, and the City's position with respect thereto.

In short, by disregarding the Court's rules and failing to set forth in a cogent and concise manner the facts of the case pertinent to the motion, the parties have imposed substantial additional work on the Court and delayed the resolution of their case.

1892 statute created the New York City DOB, from what had been known as the Fire Department's bureau of inspection of buildings, and vested it with the authority to enforce the provisions of what eventually became known as the New York City Building Code. L. 1892 ch. 275.

With the consolidation of New York City in 1897–98, and the enactment of the first City Charter in 1897, the enforcement of existing regulations, as well as the power to pass new ones, passed to City officials. *City of New York v. M. Wineburgh Advertising Co.*, 122 A.D. 748, 107 N.Y.S. 478 (1st Dep't 1907) (discussing L. 1897, ch. 378, § 644 *et seq.*). As the New York Court of Appeals explained more than a century ago, "The [New York City] Building Code was enacted October 24, 1899. The revised charter of the city of New York of 1901 confirmed its provisions (L. 1901, ch. 466, § 407), which, therefore, are to be given the same force within the limits of the city, as a statute." *Racine v. Morris*, 201 N.Y. 240, 244, 94 N.E. 864 (1911) (citing *City of New York v. Trustees, etc.*, 85 App.Div. 355, 83 N.Y.S. 442 (1st Dep't 1903), *aff'd on opn. below*, 180 N.Y. 527, 72 N.E. 1140 (1905)).

The purpose of the Building Code is, and always has been, to protect the public from the dangers posed by poorly constructed buildings: "The purpose of this code is to [regulate] building construction in the city of New York *in the interest of public safety, health, welfare and the environment.*" N.Y. City Admin. Code § 28–101.2 (emphasis added).

Statutes pertaining to cranes have long been part of New York City's Building Code. N.Y. City Admin. Code, Title 28, Chapter 7 (the "Building Code"). City hoisting regulations were first enacted in 1928, and have continually been in force since. Ocharsky Decl. ¶ 31; *see also* Selvin Decl., Ex. H (1928 City Ordinances),

Ex. I (1940 City Ordinances), Ex. J (1969 City Law). The City Statutes were most recently revised, with respect to tower cranes, following a widely publicized accident in midtown Manhattan in 2008, in which seven people died and several surrounding buildings were heavily damaged; following the accident residents of eighteen buildings had to be evacuated. Ocharsky Decl. ¶ 81, Ex. A, Pictures 47–49.

The City's public safety concerns are hardly contrived. An engineer for the City explains that, because New York City is the most densely populated major city in the United States, construction worksites necessarily abut, or even spill over into adjoining lots and public streets. Cranes, which can be as tall as 1800 feet, and move loads as heavy as 825 tons (*id.* ¶¶ 23, 28), do not confine themselves to the property on which they are being used when they break, or worse, collapse; they inevitably damage surrounding buildings and risk injuring people in their homes and on the street. The declaration of Jason Ocharsky, an engineer with the City's DOB, discusses several crane-related accidents, identifying more than 50 instances of objects falling while being hoisted outside a building in New York City in a five year span, resulting in 21 injuries and one fatality. Over the same five year span, there were more than 40 instances where hoisting machines, including cranes, fell over, resulting in more than 40 injuries, along with nine fatalities. *Id.*, ¶¶ 7–12; *see also id.* ¶¶ 20–21, 24, 29, Pictures 7–10, 17–20. The economic damage caused by these accidents, though not detailed, is obviously substantial. Cranes therefore pose a unique risk to public safety in New York City-at least when they are used away from isolated commercial or industrial yards. Ocharksy Decl. ¶¶ 6, 13–14, 17–18, 25–27.

The City Statutes regulate cranes and derricks (and other "hoisting equipment") used in the City through a system of certification, permitting, and inspection. *See, e.g.,* N.Y. City Admin. Code § 28–3316.5 ("Hoisting equipment, its supports and runback structures shall be designed, constructed and inspected in accordance with rules promulgated by the commissioner."). They are found in the New York City Building Code chapter addressed to the construction and demolition of buildings, and they are enforced by the DOB. N.Y. City Admin. Code, Title 7, Chapter 33, which provides:

> The provisions of this chapter shall govern the conduct of all construction or demolition operations with regard to the safety of the public and property. For regulations relating to the safety of persons employed in construction or demolition operations, OSHA Standards shall apply.

N.Y. City Admin. Code § 28–3301.1; *see also id.* § 28–101.2 ("The purpose of this code is to [regulate] building construction in the city of New York in the interest of public safety, health, welfare and the environment."). Chapter 33 specifically promulgates rules that address public safety concerns, leaving it to OSHA to promulgate worker protection standards.

Section 3316 regulates hoisting equipment generally, including cranes, and requires that, "Hoisting equipment, its supports and runback structures shall be installed, operated, and maintained to eliminate hazard to the public or to property," and that hoisting machines be made inoperable for unauthorized use in a manner acceptable to the DOB. N.Y.

City Admin. Code § 28–3316.2. In addition, section 3316 requires:

- That when there has been an accident involving hoisting equipment, the owner or the person in charge immediately notify the DOB, and take steps to assure that the broken equipment is not used or taken from the scene. *Id.* § 28–3316.3.

- That hoisting equipment be "constructed and inspected" in accordance with rules promulgated by the agency. *Id.* § 28–3316.5.

- That ropes used with hoisting machines be inspected and replaced in accordance with agency rules. *Id.* § 28–3316.6.

- That hoisting machines be operated in accordance with the stricter of manufacturers' requirements, or requirements promulgated by the City agency, and not be used to hoist loads while the hoisting machine is being "installed, jumped, dismantled or altered." *Id.* § 28–3316.7.

- And, that hoisting machines be maintained in accordance with the stricter of manufacturer requirements, or requirements promulgated by the agency. *Id.* § 28–3316.8

Section 28–3319 of the Building Code, specifically N.Y. City Admin. Code § 28–3319.1, addresses cranes and derricks. *See also* Reference Standard ("RS") 19–2.[2] City regulations define a "crane" as, "A power operated machine for lifting and lowering a load and moving it horizontally which utilizes wire rope and in which the hoisting mechanism is an integral part of the machine." Reference Standard 19–2,

---

2. Although the Reference Standards—City regulations that specify the requirements allegedly preempted in the case—are obviously critical, the parties failed to provide a copy to the Court, or even to explain where they might be found. The interested reader can find a copy of the City regulations online, at the City's website: http://www.nyc.gov/html/dob/downloads/pdf/rs_19–2.pdf.

§ 2.19. A "derrick" is defined as "An apparatus consisting of a mast or equivalent members held at the top by guys or braces, with or without a boom, for use with a hoisting mechanism and operating rope, for lifting or lowering a load and moving it horizontally." *Id.*, § 2.21.

Section 28–3319 requires that all operators be licensed, New York City Administrative Code § 28–3319.2, and prohibits crane and derrick owners from putting their equipment into use, "without [1] a certificate of approval, [2] a certificate of operation and [3] a certificate of on-site inspection." *Id.* § 28–3319.3.

There are several exceptions to the licensing and certification requirements, including one for "cranes or derricks used in industrial or commercial plants or yards not used for the construction of the facility." *Id.* § 28–3319.3(6). Under the City Regulations, the DOB does not regulate cranes if the crane is not within a boom's length of an adjoining property line. RS 19–2, § 8.1.3. This exception is in keeping with the limited jurisdiction of the DOB, as set forth in the City Charter; section 643(3) of the Charter provides that the DOB shall only have jurisdiction to regulate cranes and derricks with respect to "the testing and approval of power-operated cranes and derricks used for construction, alteration, demolition, excavation and maintenance purposes, including such uses in highways or sewers, or used to hoist or lower any article on the outside of any building, *excluding cranes and derricks used in industrial plants or yards.*" N.Y. City Charter 643(3) (emphasis added).

The Charter's limitation on DOB jurisdiction is also in keeping with the Building Code's express statement that it reaches crane and derrick construction matters only to the extent they implicate *public* safety, leaving to OSHA regulation of employee health in safety. *See* N.Y. City Admin. Code § 28–3301.1. Because cranes and derricks used solely within industrial plants and yards only present a danger to employees, they are outside the reach of the Building Code provisions. Ocharsky Decl., ¶¶ 61, 97–98; Decl. of Selvin, Ex. K.

Section 28–3319.4 sets forth the requirements for obtaining a certificate of approval. As pertinent here, it says that, "The manufacturer, owner, or designated representative of a crane or derrick for which a certificate of approval is sought shall file an application for such certificate of approval and provide such information as set forth in rules promulgated by the commissioner." *See* RS 19–2, §§ 3.0–3.2 (information required by City rules).

City regulations address the design and construction of mobile cranes. They require that all cranes built before 2006 comply with industry standard set in 1968, while all cranes built after 2006 comply with industry standards set in 2004. *See* RS 19–2, § 4.1. The City regulations also provide for a prototype test for each kind of mobile crane for which approval is sought. *Id.* § 4.2; *see generally* Ocharsky Decl., ¶¶ 83–96 (discussing design standards, certificates of approval). The City's engineer avers that, to date, no application for a certificate of approval for any particular crane design has ever been denied. Ocharsky Decl., ¶ 87.

Section 28–3319.5 says that the initial certificate of operation shall be issued with the certificate of approval, once an inspection and test shows that the crane or derrick is in "safe operating condition." Thereafter, it is the responsibility of the owner of the crane or derrick to renew the certificate of operation annually, or when certain modifications identified in the statute are made. *Id.; see* Ocharsky Decl. ¶¶ 35–43.

Finally, the end-user of the crane or derrick, or his representative, must apply for a certificate of on-site approval for each jobsite where it is used. *Id.* § 28–3319.6; *see generally* Ocharsky Decl. ¶¶ 44–62. The application must contain whatever information is required by rules promulgated by the agency, and the crane or derrick must pass an inspection and be found satisfactory to the agency. *See* RS 19–2, §§ 8.0–8.5. Once the equipment is approved, the certificate of on-site inspection is good for one year. *See* RS 19–2, § 10.0 (incorporating §§ 15.1, 18.1).

Tower and climber cranes must meet additional requirements to obtain the certificate of on-site approval, and are subject to additional regulations concerning their "erection, jumping, climbing, and dismantling." *Id.* § 28–3319.8–.8.8. A "tower crane" is defined as, "A crane in which a boom, swinging jib or other structural member is mounted on a vertical mast or tower," and a "climber crane" is defined as, "A crane erected upon and supported by a building or other structure which may be raised or lowered to different floors or levels of the building or structure." RS 19–2, § 2.44.2, 2.16.2; see also 29 C.F.R. § 1926.1401.

Before tower and climber cranes can be employed, a plan for erection, jumping, climbing and dismantling, must be submitted and approved in connection with the application for an on-site certificate, *id.* § 28–3319.8.1; a safety coordination meeting must be held prior to the initial erection, dismantling, or "jump down" of a tower or crawler crane, *id.* § 28–3319.8.2, and before the crane is "jumped," *id.* § 28–3319.8.3, *see also id.* § 28–3319.8.5 (listing topics covered in pre-jumpy safety meeting); the DOB must be notified of any safety coordination meetings at least 48 hours in advance, *id.* § 28–3319.8.4.1; and prior to "jumping or climbing tower of climber crane, the engineer of record for the crane must provide" the DOB with a certificate reporting that her inspection of the crane revealed no hazardous conditions, and that the crane was installed according to the plan submitted with the application for a certificate of on-site approval, *id.* § 28–3319.8.7. The regulations also require specific operations during the erection, jumping, climbing, and dismantling of tower and climber cranes. *Id.* § 28–3319.8.8; *see generally* Ocharsky Decl., ¶¶ 78–82.

Section 28–3319 also regulates the use of slings and ropes in connection with cranes and derricks, N.Y. City Admin. Code § 28–3319.9, RS 19–2, §§ 18.1–18.3; and requires minimum operator training and certification, § 28–3319.10.

Finally, the City regulations give the DOB power to issue stop work orders when it finds that any hoisting machine, including a crane, is "dangerous or unsafe." RS 19–2, § 9.1.

## B. *Federal laws and crane regulations*

Congress passed the Occupational Safety and Health Act ("OSH Act") in 1970. Its purpose was "to assure so far as possible every working man and woman in the Nation safe and healthful working conditions and to preserve our human resources." 29 U.S.C. § 651(b). Through this legislation, the federal government entered into a field that traditionally had been occupied by the states. *Gade v. Nat'l Solid Wastes Mgmt. Ass'n,* 505 U.S. 88, 96, 112 S.Ct. 2374, 120 L.Ed.2d 73 (1992).

The OSH Act authorizes the Secretary of Labor to promulgate federal occupational safety and health standards. 29 U.S.C. § 655. An "occupational safety and health standard" is defined as a "standard which requires conditions, or the adoption or use of one or more practices, means, method, operations, or processes, reasonably neces-

sary or appropriate to provide safe or healthful employment and places of employment." 29 U.S.C. § 652(8). Pursuant to the OSH Act, the Secretary of Labor has delegated certain statutory responsibilities the Occupational Safety and Health Administration ("OSHA"). *See Gade,* 505 U.S. at 92, 112 S.Ct. 2374 (citing *Martin v. Occupational Safety and Health Review Comm'n,* 499 U.S. 144, 147 n. 1, 111 S.Ct. 1171, 113 L.Ed.2d 117 (1991)). OSHA, in turn, has promulgated occupational safety and health standards relating to many industries. One set of OSHA regulations relates to the use of hoisting equipment, such as cranes and derricks. *See generally* 29 C.F.R., Part 1926, Subpart CC ("Cranes and Derricks in Construction"), Subpart DD ("Cranes and Derricks used in Demolition and Underground Construction") (hereafter, the "OSHA Crane Regulations").

As observed by the First Circuit, "OSHA placed primary responsibility on employers, those individuals who oversee and control the work environment, to achieve compliance with its standards and insure a safe workplace." *Reich v. Simpson, Gumpertz & Heger, Inc.,* 3 F.3d 1, 4 (1st Cir.1993) (citing S.Rep. No. 1282, 91st Cong., 2d Sess. 9 (1970), reprinted in 1970 U.S.C.C.A.N. 5177, 5186 ("Employers have primary control of the work environment and should insure that it is safe and healthful.")); *see also Lindsey v. Caterpillar, Inc.,* 480 F.3d 202, 208 (3d Cir.2007) ("The Act is limited in scope, however, as jurisdiction under the Act extends only to the employee-employer relationship within the workplace."). OSHA regulations, therefore, generally do *not* apply to persons other than employers, such as owners or lessors of equipment that is provided to end-users who employ construction workers, or owners of a place where employment activities take place—unless, of course, those entities are also "employers"

within the meaning of the regulations. *See, e.g., Reich,* 3 F.3d at 4–5 (architect with no employees at job site when accident occurred not subject to OSHA regulations); *Anthony Crane Rental, Inc. v. Reich,* 70 F.3d 1298 (D.C.Cir.1995) (lessor of crane with no employees at jobsite not subject to OSHA regulations).

The OSHA Crane Regulations address a broad swath of occupational safety and health issues, including ground conditions for areas where cranes will be used, 29 C.F.R. § 1926.1402; assembly and disassembly of equipment, *id.* §§ 1926.1403–.1406; powerline safety on the worksite, *id.* §§ 1926.1407–.1411; equipment and wire rope inspections, *id.* §§ 1926.1412–.1414; safety equipment, operational aids, and equipment operation, *id.* §§ 1926.1415–.1417; signals between workmen, *id.* §§ 1926.1419–.1422; fall protection for workers, *id.* § 1926.1423; work area safety regulations, *id.* §§ 1926.1424–.1426; operator qualification, certification, and training, *id.* §§ 1926.1427–.1430; hoisting of personnel on the worksite, *id.* § 1926.1431; and crane design, construction, and testing, *id.* § 1926.1433. There are also regulations pertaining specifically to tower cranes, *id.* § 1926.1435, derricks, *id.* § 1926.1436, and a variety of other specific crane types. *Id.* §§ 1926.1437–.1440; *see generally* C.F.R. § 1926.1501.

### C. Plaintiff's challenge to the City Crane Statutes

The issue in this case is whether the OSHA Crane Regulations preempt the New York City Building Code crane regulations.

Section 18 of the OSH Act (codified at 29 U.S.C. § 667), in combination with OSHA-promulgated occupational safety and health standards, preempts state laws that have a direct and substantial effect on

worker safety and health in areas already regulated by OSHA.[3] However, section 18(a), titled "Assertion of State standards in absence of applicable Federal standards," allows States to regulate occupational safety and health issues in areas where the Federal government has not regulated:

> Nothing in this chapter shall prevent any State agency or court from asserting jurisdiction under State law over any occupational safety or health issue with respect to which no standard is in effect under section 655 of this title.

29 U.S.C. § 667(a). States are also free to regulate occupational safety and health in areas covered by OSHA standards, but only if the Secretary of Labor approves a state plan that wholly displaces the OSHA regulatory scheme. Subsection 18(b), titled, "Submission of State plan for development and enforcement of State standards to preempt applicable Federal standards," provides that:

> Any State which, at any time, desires to assume responsibility for development and enforcement therein of occupational safety and health standards relating to any occupational safety or health issue with respect to which a Federal standard has been promulgated under section 655 of this title shall submit a State plan for the development of such standards and their enforcement.

29 U.S.C. § 667(b). The remaining subsections of section 18 govern the implementation, oversight and modification of approved State plans. *Id.* § 667(c)-(h).

Plaintiff represents the interests of its members, businesses that own or operate cranes used in New York City. It commenced this action in July 2009, alleging that the City Crane Statutes and the corresponding regulations are preempted by the OSH Act, that they violate the Dormant Commerce Clause, and that they violate Plaintiff's members' procedural and substantive Due Process rights. (ECF No. 1; *see also* ECF No. 67, at 4–5.) In January 2010, Plaintiff filed a motion for partial summary judgment, seeking a declaration that the City Crane Statutes are preempted as a matter of law. (ECF No. 16.) A month later, the City cross-moved for summary judgment in its favor on all counts. (ECF Nos. 24, 25.) However, because the OSHA Crane Regulations were in the process of being amended, the City also asked that the Court stay decision on the motions until the new regulations were finalized. (*Id.*)

In August 2010, this Court denied the cross-motions, without prejudice, and stayed the case, so the new OSHA regulations could take effect and Plaintiff could file a motion to amend its complaint in response to the changes. (ECF No. 57.) The OSHA Crane Regulations were published in their current form on August 9, 2010, and went into effect November 8, 2010. The Court, on Plaintiff's motion, permitted Plaintiff to amend its complaint, and asked the parties to re-submit their original summary judgment motions with short addenda addressing the effect, if any, of the regulatory changes. (ECF No. 67, at 13.)

The motions were resubmitted earlier this year. The Secretary of Labor has moved for leave to file an amicus brief (ECF. 69), which motion is hereby GRANTED. I have considered the Secretary's brief while deciding this motion.

---

**3.** By contrast, state law personal injury suits are expressly not preempted. 29 U.S.C. § 653(b)(4); *Lindsey,* 480 F.3d at 209; *see* *also Businesses for a Better New York v. Angello,* 2007 WL 2892615, at *5 (W.D.N.Y. September 28, 2007) (collecting cases).

## DISCUSSION

### A. Preemption and the Supremacy Clause (Counts I and II)

The parties agree, and are correct, that the preemption issue raised on this motion is a pure issue of law, amenable to summary disposition. *See Pacific Gas and Elec. Co. v. State Energy Resources Conservation & Development Com'n*, 461 U.S. 190, 201, 103 S.Ct. 1713, 75 L.Ed.2d 752 (1983).

#### 1. Controlling law

The "Constitution establishes a system of dual sovereignty between the States and the Federal Government," in order to "reduce the risk of tyranny and abuse from either front." *Gregory v. Ashcroft*, 501 U.S. 452, 457, 111 S.Ct. 2395, 115 L.Ed.2d 410 (1991). This balance of power translates into sovereignty for the states that is "concurrent with that of the Federal Government, subject only to limitations imposed by the Supremacy Clause." *Tafflin v. Levitt*, 493 U.S. 455, 458, 110 S.Ct. 792, 107 L.Ed.2d 887 (1990).

The Supremacy Clause, Article VI, Clause 2 of the Constitution, provides that the laws of the United States "shall be the supreme Law of the Land ... any Thing in the Constitution or Laws of any state to the Contrary notwithstanding." U.S. Const. art. VI, cl. 2. Thus, when Congress determines, implicitly or explicitly, that Federal law should control on a given issue, State law is "preempted" and must give way. As the Supreme Court has explained, this clause represents an "extraordinary" grant of power, and gives the Federal Government "a decided advantage" in the dynamic between state and federal sovereigns. *Gregory*, 501 U.S. at 460, 111 S.Ct. 2395.

However, the power vested in the Federal Government is not limitless. The Constitution confers upon Congress "not all governmental powers, but only discrete, enumerated ones," *Printz v. United States*, 521 U.S. 898, 919, 117 S.Ct. 2365, 138 L.Ed.2d 914 (1997), and the Tenth Amendment reserves to the states, "The powers not delegated to the United States by the Constitution, nor prohibited by it," U.S. Const. amend. X. Put otherwise, as the Framers observed, the Constitution by design conveys "few and defined" powers to the Federal Government, while designating "numerous and indefinite" powers to the states. *The Federalist No. 45*, at 237–38 (James Madison) (M. Beloff ed., 2d ed. 1987).

■ "The regulation of health and safety matters is primarily, and historically, a matter of local concern," and therefore among those powers reserved to the states. *Hillsborough County, Fla. v. Automated Med. Labs., Inc.*, 471 U.S. 707, 719, 105 S.Ct. 2371, 85 L.Ed.2d 714 (1985). Throughout history, the "States traditionally have had great latitude under their police powers to legislate as to the protection of the lives, limbs, health, comfort, and quiet of all persons." *Metropolitan Life Ins. Co. v. Massachusetts*, 471 U.S. 724, 756, 105 S.Ct. 2380, 85 L.Ed.2d 728 (1985) (internal quotations omitted), *overruled in part on other grounds by Kentucky Ass'n of Health Plans, Inc. v. Miller*, 538 U.S. 329, 123 S.Ct. 1471, 155 L.Ed.2d 468 (2003).

■ With respect to such matters, it is presumed that a federal regulation or regulatory scheme is not intended to preempt supplementary state regulation. As the Second Circuit has explained:

> we start with the assumption that the historic police powers of the States were not to be superseded by the Federal Act unless that was the clear and manifest purpose of Congress. The presumption against preemption is heightened where

federal law is said to bar state action in fields of traditional state regulation. Given the traditional primacy of state regulation of matters of health and safety, courts assume' that state and local regulation related to those matters can normally coexist with federal regulations.

*New York State Restaurant Ass'n v. New York City Bd. of Health*, 556 F.3d 114, 123 (2d Cir.2009); *see also Wyeth v. Levine*, 555 U.S. 555, 129 S.Ct. 1187, 173 L.Ed.2d 51 (2009).

Nevertheless, Congressional intent ultimately governs the determination whether federal law preempts state law. *See Gade*, 505 U.S. at 96, 112 S.Ct. 2374. Thus, the Supreme Court has often observed that, "The purpose of Congress is the 'ultimate touchstone' in every preemption case." *Medtronic, Inc. v. Lohr*, 518 U.S. 470, 485, 116 S.Ct. 2240, 135 L.Ed.2d 700 (1996) (citation omitted). Therefore, "any understanding of the scope of a preemption statute must rest primarily on 'a fair understanding of *congressional purpose*' " *Id.* at 485–86, 116 S.Ct. 2240 (citations omitted) (emphasis in original). While Congressional intent is divined primarily "from the language of the preemption statute and the surrounding 'statutory framework,' " courts should also analyze the "structure and purpose of the statute as a whole." *Id.* at 486, 116 S.Ct. 2240.

█ If Congress so intends, "Preemption ... is compelled whether Congress' command is explicitly stated in the statute's language or implicitly contained in its structure and purpose." *Gade*, 505 U.S. at 98, 112 S.Ct. 2374 (citation and quotation omitted). Thus, the Supreme Court has recognized three types of preemption: (1) express preemption, where the statute contains "explicit preemptive language," (2) field preemption, "where the scheme of federal regulation is so pervasive as to make reasonable the inference that Congress left no room for the States to supplement it," and (3) conflict preemption, "where compliance with both federal and state regulations is a physical impossibility, or where state law stands as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress." *Id.* (citations and quotations omitted).[4]

However, with respect to the two types of "implied preemption" (field preemption and conflict preemption) the Supreme Court has recognized that its categorical approach may obscure the relationship between the doctrines. A footnote in the *English v. General Elec. Co.* explains:

> By referring to these three categories [of preemption], we should not be taken to mean that they are rigidly distinct. Indeed, field preemption may be understood as a species of conflict pre-emption: A state law that falls within a preempted field conflicts with Congress' intent (either express or plainly implied) to exclude state regulation.

496 U.S. 72, 79 n. 5, 110 S.Ct. 2270, 110 L.Ed.2d 65 (1990).

This recognition played an important part in the Supreme Court's analysis of the very issue presented by this case: the preemptive scope of the OSH Act and OSHA regulations promulgated pursuant to it. In *Gade v. National Solid Wastes Management Association*, 505 U.S. 88, 112 S.Ct. 2374, 120 L.Ed.2d 73 (1992), the Supreme Court interpreted the OSH Act generally to preempt any State law that directly and substantially regulates worker

---

4. "Federal regulations as well as federal statutes can preempt state law." *Environmental Encapsulating Corp. v. City of New York*, 855 F.2d 48, 53 (2d Cir.1988) (citing *Hillsborough*, 471 U.S. at 713, 105 S.Ct. 2371).

safety or health on an issue covered by OSHA regulations, where no preempting State plan had been submitted to the Secretary of Labor for approval under section 18(b).

At issue in *Gade* were two Illinois statutes, passed in 1988, that regulated the training and licensing of workers in the hazardous waste industries. The stated purpose of these laws was twofold: "both 'to promote job safety' and 'to protect life, limb and property.'" *Id.* at 91, 112 S.Ct. 2374. The Supreme Court therefore referred to the laws as "dual purpose" laws—ones that sought both to protect workers from workplace hazards, and to protect the public welfare generally.

However, in 1986, OSHA had promulgated regulations touching some of the same issues, in particular, the training and certification of workers engaged in an activity that might expose them to hazardous wastes. *Id.* at 92–93, 112 S.Ct. 2374. The state law and the federal regulations were both explicitly promulgated to protect worker safety, and they were consistent in many respects. But they differed in others. For example, under Illinois law, an employee applying to be licensed as a hazardous waste crane operator was required to complete 500 days of training; under OSHA regulations, 3 days would have sufficed. *Id.* at 93–94, 112 S.Ct. 2374.

The Supreme Court took the case to decide the preemptive effective of the OSH Act and OSHA regulations on so-called "dual purpose" laws, like the Illinois licensing statutes—laws that sought both to protect workers and to protect the public generally. *Id.* at 95–96, 112 S.Ct. 2374 (collecting cases); *see also* Richard C. Ausness, THE WELDING-FUME CASE AND THE PREEMPTIVE EFFECT OF OSHA's HAZCOM STANDARD ON COMMON LAW FAILURE TO WARN CLAIMS, 54 Buff. L. Rev. 103, n. 138–231

and accompanying text (2006) (collecting pre-*Gade* OSH Act preemption case law).

Five justices ultimately concluded that dual purpose laws were preempted by section 18(b) of that OSH Act. However, no rationale commanded a majority.

Writing for a four-Justice plurality, Justice O'Connor concluded that State regulation on worker safety issues already addressed by OSHA regulations was impliedly preempted by section 18(b). Looking to the Congressional intent underlying section 18 of the OSH Act, the plurality concluded that "non-approved state regulation of occupational safety and health issues for which a federal standard is in effect is impliedly preempted as in conflict with the full purposes and objectives of the OSH Act." *Gade,* 505 U.S. at 98–99, 112 S.Ct. 2374.

This conclusion rested primarily on an inference from the statute's design:

> The design of the statute persuades us that Congress intended to subject employers and employees to only one set of regulations, be it federal or state, and that the only way a State may regulate an OSHA-regulated occupational safety and health issue is pursuant to an approved state plan that displaces the federal standards.

*Id.* at 99, 112 S.Ct. 2374. In other words, the plurality believed that any duplicative local regulation was necessarily in conflict with a Congressional "purpose and objective" of non-overlapping regulation—even if the overlapping regulations were consistent with, or identical to, corresponding federal regulations. *Id.* at 100, 112 S.Ct. 2374. In a footnote, the plurality acknowledged that "we could as easily have stated that the promulgation of a federal safety and health standard 'pre-empts the field' for any nonapproved state law regulating the same safety and health issue." *Gade,* 505 U.S. at 103–04, n. 2, 112 S.Ct. 2374

(citing *English,* 496 U.S. at 79, n. 5, 110 S.Ct. 2270).

Justice Kennedy provided the fifth vote in favor of preemption, but did not join in the plurality's analysis. Rather, he thought that section 18(b) *expressly,* not impliedly, preempted State regulations on issues for which an OSHA occupational safety and health standard was in effect—notwithstanding the absence of express preemptive language. *Gade,* 505 U.S. at 109–14, 112 S.Ct. 2374 (Kennedy, J., concurring in part and concurring in the judgment).

Notably, Justice Kennedy, like the four dissenting justices, *rejected* the plurality's statement that any and every State regulation on an occupational safety and health issue covered by OSHA regulation was "in conflict" with the Congressional purpose:

> I do not believe that supplementary state regulation of an occupational safety and health issue can be said to create the sort of actual conflict required by our decisions. The purpose of state supplementary regulation, like the federal standards promulgated by the Occupational Safety and Health Administration (OSHA), is to protect worker safety and health. Any potential tension between a scheme of federal regulation of the workplace and a concurrent, supplementary state scheme would not, in my view, rise to the level of actual conflict described in our pre-emption cases. Absent the express provisions of § 18 of the Occupational Safety and Health Act of 1970 (OSH Act), 29 U.S.C. § 667, I would not say that state supplementary regulation conflicts with the purposes of the OSH Act, or that it interferes with the methods by which the federal statute was designed to reach its goal.

*Id.* at 110–11, 112 S.Ct. 2374 (internal citations, quotation marks, and alterations omitted). "Nonetheless," Justice Kennedy "agree[d] with the Court that the OSH Act pre-empts all state occupational safety and health standards *relating to any occupational safety or health issue* with respect to which a Federal standard has been promulgated," unless a State plan has been submitted and approved. *Id.* at 111, 112 S.Ct. 2374 (quoting majority opinion) (emphasis added).

A majority of the justices agreed on the scope of OSH Act preemption. Writing for five justices on this point, Justice O'Connor held that laws, like the Illinois licensing statute, "that directly, substantially, and specifically regulate[ ] occupational safety and health," constitute "occupational safety and health standards," and are preempted if they relate to an issue where OSHA has regulated. This is so even if the law has a second purpose or goal of protecting public health. *Id.* at 104–08, 112 S.Ct. 2374. The majority explained:

> Our precedents leave no doubt that a dual impact state regulation cannot avoid OSH Act preemption simply because the regulation serves several objectives rather than one. As the Court of Appeals observed, "[i]t would defeat the purpose of section 18 if a state could enact measures stricter than OSHA's and largely accomplished through regulation of worker health and safety simply by asserting a non-occupational purpose for the legislation." Whatever the purpose or purposes of the state law, pre-emption analysis cannot ignore the effect of the challenged state action on the pre-empted field. The key question is thus at what point the state regulation sufficiently interferes with federal regulation that it should be deemed pre-empted under the Act.

> In *English v. General Electric Co.,* we held that a state tort claim brought by an employee of a nuclear-fuels produc-

tion facility against her employer was not preempted by a federal whistle-blower provision because the state law did not have a "direct and substantial effect" on the federal scheme. In the decision below, the Court of Appeals relied on *English* to hold that, in the absence of the approval of the Secretary, the OSH Act pre-empts all state law that "constitutes, in a direct, clear and substantial way, regulation of worker health and safety." We agree that this is the appropriate standard for determining OSH Act preemption.

*Id.* at 106–07, 112 S.Ct. 2374. Thus, the general rule that emerges from *Gade* is that a State regulation that "directly and substantially" regulates worker safety and health is preempted if there is an OSHA regulation addressing the same issue, unless the State has submitted and obtained approval for a

However, the *Gade* majority carved out an important exception to this rule: It held that State laws having a "direct and substantial effect" on worker safety issues already addressed by OSHA regulations are *not preempted* if they are laws of "general applicability" and "cannot fairly be characterized as 'occupational standards'":

> On the other hand, state laws of *general applicability* (such as laws regarding traffic safety or fire safety) that do not conflict with OSHA standards and that regulate the conduct of workers and non-workers alike would generally not be pre-empted. Although some laws of general applicability may have a "direct and substantial" effect on worker safety, they cannot fairly be characterized as "occupational" standards, because they regulate workers simply as members of the general public.

*Id.* at 107, 112 S.Ct. 2374 (emphasis added). Such laws are preempted only to the extent that they actually conflict with OSHA regulations.

Thus, deciding whether regulations under the OSH Act preempt local regulation requires a court to ask three questions:

(1) Does a purportedly preempted State or local law touch an issue already regulated by the OSH Act or OSHA regulations? If the Federal government has not addressed that issue at all, then the State is free to regulate as it sees fit under the express terms of section 18(a). *See* 29 U.S.C. § 667(a).

(2) Has OSHA occupied the field, thereby preempting any local regulation? If there is a Federal occupational safety and health standard in place on a given issue, and the State law "constitutes, in a direct, clear and substantial way, regulation of worker health and safety," *Gade*, 505 U.S. at 107, 112 S.Ct. 2374, then it is preempted, regardless of whether it actually conflicts with the Federal regulation. However, there can be no "field preemption" if the State law is one of general applicability within the meaning of *Gade*. The defining characteristic of such laws is that they "regulate workers simply as members of the general public," or have as their sole purpose the protection of the public, with any regulation of employers and employees being purely incidental to the protection of the public. *Id.; see also Environmental Encapsulating*, 855 F.2d at 55 ("Local legislation enacted for the *sole purpose* of protecting the public health would not, on its face, be preempted by the Act.") (Emphasis added).

(3) Since even State laws of general applicability are preempted if they actually conflict with the federal regulation addressing the same issue, are there specific provisions of the State law of general applicability that actually conflict with the federal regulations addressing the same issues?

## 2. *Application of law to facts*

The City Statutes address issues that are also addressed by OSHA regulations, and have a direct and substantial impact on worker safety. This brings them within the preemptive scope of the OSH Act defined in *Gade*. They are, however, saved from field preemption under *Gade*'s exception for laws of general applicability.

Therefore, the City Statutes are only preempted to the extent of any actual conflict with the OSHA Crane Regulations. And as Plaintiff has failed to identify an actual conflict requiring preemption, the City is entitled to dismissal of the complaint.

### a. *There is no field preemption, because the City Statutes fit within Gade's exception for laws of general applicability*

■ Plaintiff correctly points out that many of the City Statutes regulate issues that are also addressed by the OSHA Crane Regulations, and that the State of New York has not submitted a plan that includes the City Statutes to the Secretary, as required by the OSH Act section 18(b). It concludes that the City Statutes are therefore preempted.

However, as discussed above, OSH Act preemption is not that simple. Even where there is overlapping regulation, there is no preemption if the State law is of "general applicability." *Gade*, 505 U.S. at 107, 112 S.Ct. 2374. I conclude that the Crane Statutes, which regulate cranes *qua* structures that are capable of falling onto members of the public outside of worksites, and damaging property not located on a worksite, are laws of "general applicability," and so are explicitly excepted from preemption under *Gade*.

#### i. *Plaintiff's position entails results not intended by Congress*

The principal basis for my conclusion is the manifest absurdity of accepting Plaintiff's position. There is hardly a regulatory task the DOB performs, or a requirement the City Building Code imposes, that does not "constitute[ ], in a direct, clear and substantial way, regulation of worker health and safety," so a finding that the OSH Act preempts the City Crane Statutes would effectively wipe out much of the City Building Code. It simply cannot be the case that DOB's power to keep buildings from falling on top of people and other buildings—via rules that also help keep construction workers and crane operators safe—is superseded by the existence of OSHA regulations governing safety on a construction site. No one would suggest that DOB cannot regulate how weight should be distributed among the beams and foundation of a skyscraper, or assert that DOB is prohibited from compelling a party who wants to build a skyscraper to submit of an architect's plan as a condition of obtaining a building permit. These basic precautions, intended to prevent the building from collapsing, will have a direct and substantial safety and health benefit for the OSHA-regulated workers who build the building, and will require compliance by their OSHA-regulated employers. If the DOB can enforce regulations to ensure that a skyscraper is built so that it does not fall over onto other buildings and hapless bystanders—notwithstanding the incidental protection those regulations ensure to the OSHA-regulated workers who build it—then it stands to reason that DOB can do the same thing with cranes and derricks.

Indeed, for purposes of City regulation, a crane is a "building." The Building Code defines the word "building" as "Any structure used or intended for supporting any use or occupancy." N.Y. City Admin. Code § 28–101.5. A "structure," in turn, is defined as, "That which is built or constructed, including among others: build-

ings, stadia, tents, reviewing stands, platforms, stagings, observation towers, radio towers, tanks, trestles, open sheds, shelters, fences, and display signs." *Id.* Cranes, which rise into the air on a foundation that must be strong enough to bear it, Ocharsky Decl. ¶¶ 49–53, are certainly "structures," and they support a "use," namely construction of an edifice. Tower cranes are affixed to the sides of standing buildings to support their weight, making them a "support" and part of the building to which they are affixed. *Id.* ¶¶ 50–51. If DOB cannot regulate cranes *qua* potentially collapsing structures, then it would seem that DOB also cannot regulate the planning, construction and inspection of skyscrapers, or five-story walk-ups, or elevator repairs, or anything else having to do with buildings that requires an OSHA-regulated worker to do something potentially dangerous. That would be contrary to any reasonably assignable Congressional intent or purpose, the presumption against preemption, the legislative history of the OSH Act, the officially promulgated position of the Federal agency charged with enforcing OSHA standards, and common sense.

Examples of this sort can be multiplied. Is the City Department of Health preempted from inspecting restaurants and assuring their cleanliness because those inspections incidentally protect the health of OSHA-regulated restaurant workers, as well as the public? Is the City Department of Environmental Control preempted from inspecting asbestos abatement sites, say, an elementary school, because the contractors working there are OSHA-regulated? Is the City Fire Department preempted from requiring fire escapes in office buildings because OSHA-regulated workers may seek to flee through them? The answer, obviously, is no.

"[T]he purpose of Congress is the ultimate touchstone in every pre-emption case." *Wyeth,* 555 U.S. at 565, 129 S.Ct. 1187 (citation omitted). It is impossible that Congress could have intended such an extensive vitiation of the States' historical police powers, or such a disruptive and dangerous result. To the contrary, as the Tenth Circuit recently observed, "The OSH Act is *not* meant to interfere 'with states' exercise of police powers to protect their citizens.'" *Ramsey Winch Inc. v. Henry,* 555 F.3d 1199, 1207 (10th Cir.2009) (quoting *Lindsey v. Caterpillar, Inc.,* 480 F.3d 202, 208 (3d Cir.2007)) (emphasis in original). As those courts recognized, the OSH Act is a limited purpose statute. It was intended to address primarily the relationship between employers and employees. *Id.* It was not intended to displace local public health and safety requirements-which is what the City Building Code is.

Evidence from the Congressional record confirms this conclusion. Congressman William Steiger, a principal sponsor of the OSH Act, says in plain terms that the Act "will not supplant local building codes," notwithstanding that, "It is conceivable that there will be some overlap between certain standards developed under the bill and local regulations which cover the same substantive areas." Decl. of Selvin, Ex. C, at H 10622 (Statement of Representative Steiger (September 22, 1970), *reprinted in* Senate Subcomm. On Labor, Comm. On Labor and Public Welfare, 91st Cong., Legislative History of the Occupational Safety and Health Act of 1970, at 998 (1971)). Congress plainly was aware of the potential impact of the OSH Act on local building codes. Nonetheless, it did not include an express preemption clause in the Act. "The case for federal preemption is particularly weak where Congress has indicated its awareness of

the operation of state law in a field of federal interest, and has nonetheless decided to stand by both concepts and to tolerate whatever tension there [is] between them,'" by failing to enact an express preemption clause. *Wyeth,* 555 U.S. at 574–75, 129 S.Ct. 1187 (quoting *Bonito Boats, Inc. v. Thunder Craft Boats, Inc.,* 489 U.S. 141, 166–167, 109 S.Ct. 971, 103 L.Ed.2d 118 (1989)); *see also California Federal Sav. and Loan Ass'n v. Guerra,* 479 U.S. 272, 287–88, 107 S.Ct. 683, 93 L.Ed.2d 613 (1987). In *Wyeth,* the Supreme Court observed that Congress did not expressly preempt state tort remedies against drug-makers for failure despite their 70 year coexistence with FDA regulatory power. Here, Congress has not expressly preempted local building codes despite 40 years of co-existence with OSHA regulation. In both cases, the unavoidable inference is that Congress did not, and does not, perceive local building codes to be a problem.

Plaintiff fails to provide any limiting principle to its theory of preemption. It argues that preemption applies, without exception, whenever a State or local law has the substantial effect of regulating workplace safety. *Gade* does not compel such an absurd result. On the contrary: it explicitly avoids that result by saving laws of general applicability, like fire and traffic safety laws—laws that would be preempted under Plaintiff's broad theory of preemption.

The Building Code provisions in this case are analogous to the fire and traffic safety laws expressly saved from preemption in *Gade.* Although—like fire and traffic safety regulations—the City Statutes have a direct and substantial effect on worker safety and health in areas where OSHA has regulated, they are not preempted, because their purpose—their sole purpose—is the protection of public safety. Their impact on construction workers and their employers is merely incidental. Indeed, the City Statutes impose obligations on owners and lessors of cranes, who, as noted above, are not subject to OSHA regulations unless they are also employers. Furthermore, the City Charter and DOB regulations limit the applicability of the City Statutes to those situations where a crane accident would almost certainly have an impact outside of a construction site. Cranes at sites where no such impact is foreseeable (admittedly a small subset of New York City) are not subject to the local regulations.

In this respect, the City Statutes are not "dual purpose laws," but *sole purpose* laws—aimed exclusively at the protection of the people and property endangered by collapsing cranes. As the Second Circuit recognized (in a pre-*Gade* case), "the OSH Act only preempts regulation in the area of occupational health and safety. Local legislation enacted for the sole purpose of protecting the public health would not, on its face, be preempted by the Act." *Environmental Encapsulating,* 855 F.2d at 55. Any incidental benefit to OSHA-regulated workers provided by the City Building Code does not change the ultimate conclusion.

It bears nothing that the United States Department of Labor ("DOL")—the agency ultimately responsible for the administration of the OSHA Crane Regulations—agrees with the City that its Crane Statutes are not preempted by the OSH Act or the OSHA Crane Regulations. In a section of the new, 2010 regulations, titled "Federalism," the DOL states specifically its view that the City Crane Statutes are not preempted by the OSHA Crane Regulations. Furthermore, the agency adopted its position *before* the original summary judgment motions in this action were dismissed without prejudice in anticipation of

the new regulations; the Secretary of Labor filed an amicus brief in support of the City in the original round of briefing, and has done so again here.

The agency takes the position that the OSH Act and OSHA regulations do not preempt local building codes at all, and that, in any event, the City Statutes were laws of general applicability within the meaning of *Gade.* The revised regulations explain:

> The Secretary has interpreted the Act as not preempting laws such as building codes and OSHA rulemaking has long proceeded on the assumption that local building codes exist in parallel to OSHA regulations and are not preempted by them. For example, in the preamble to the final rule on Exit Routes, Emergency Action Plans, and Fire Prevention Plans, OSHA commended the effectiveness of building codes while declining to recognize compliance with building codes as compliance with the OSHA standard (67 FR 67950, 67954, Nov. 7, 2002). Strong policy considerations bolster this understanding. Work practices and conditions pose a variety of serious hazards to the public, and local jurisdictions have enacted a network of industrial codes, such as building and electrical codes, that touch on issues for which there are OSHA standards. If New York City's crane ordinances are preempted because of their incidental impact on worker safety, building and electrical codes, and many other types of local regulation will also be in jeopardy. The text and history of the Act give no indication that Congress intended such a sweeping preemptive effect. . . .
>
> The City's crane laws are analogous to fire and safety laws in that they comprehensively address a public hazard by imposing obligations on a wide variety of persons without regard to the existence

of an employment relationship. Many of these duties are imposed on manufacturers, owners, engineers, designated representatives and others who need not be employers or employees. By contrast, this final rule, like the prior crane rule, applies only to construction work as defined in OSHA regulations, which relates to the performance of physical trade labor on site and does not generally include engineers, who are the subject of several of the City's ordinances.

75 Fed. Reg. 48,129 (Aug. 9, 2010).

The agency's position on the issue raised by this case is entitled to considerable deference.

■ The Supreme Court recently set forth the level of deference that a court should give to an agency's pronouncements on the preemptive effect of its own regulations:

> While agencies have no special authority to pronounce on preemption absent delegation by Congress, they do have a unique understanding of the statutes they administer and an attendant ability to make informed determinations about how state requirements may pose an "obstacle to the accomplishment and execution of the full purposes and objectives of Congress." The weight we accord the agency's explanation of state law's impact on the federal scheme depends on its thoroughness, consistency, and persuasiveness.

*Wyeth v. Levine,* 555 U.S. 555, 577, 129 S.Ct. 1187, 173 L.Ed.2d 51 (2009) (internal citations omitted). Courts routinely defer to the DOL and OSHA on the preemptive effect of OSHA regulations. *See, e.g., Industrial Truck Ass'n, Inc. v. Henry,* 125 F.3d 1305, 1311–12 (9th Cir.1997); *Ohio Mfrs. Ass'n v. City of Akron,* 801 F.2d 824, 833–34 (6th Cir.1986)—unless, of course, the agency's position lacks thoroughness,

consistency and persuasiveness. *Wyeth* was just such a case.

In *Wyeth v. Levine,* 555 U.S. at 555, 129 S.Ct. 1187, the Supreme Court declined to defer to the FDA because the agency—completely reversing its long-held position on the issue—asserted, in a preamble to final regulations that was not subject to notice and comment, that its labeling regulations preempt state tort suits based on failure to warn. *Id.* at 575–79, 129 S.Ct. 1187. The Supreme Court concluded that the agency's position on preemption was thus neither thorough nor consistent.

Here, by contrast, DOL's position on preemption bears all the hallmarks that were missing in *Wyeth.* First, the DOL's position was arrived at after notice and comment, 75 Fed. Reg. 48,128 (Aug. 9, 2010), during which representatives of both the City and the construction industry were heard. This gives DOL's position the thoroughness that was lacking in *Wyeth.*

Second, the DOL's position on the preemptive effect of the OSHA Crane Regulations is consistent: consistent with the position taken by the same agency in this case about the preemptive effect of the old regulations, and consistent with the DOL's amicus brief to the Supreme Court in *Gade.* Responding to Petitioner's argument in that case that preemption of the state hazardous waste licensing acts would portend disaster for a wide variety of state and local public health and safety legislation, the Secretary emphasized the limitations imposed by the statute and the agency's prior interpretations. Thus, the brief asserts that state fire protection, boiler inspection, and building and electrical code requirements would typically *not* be preempted—even though there are OSHA standards on these subjects—because they are "laws of general applicability that only incidentally affect[ ] workers, not as a

class, but as members of the general public." Brief for the United States as Amicus Curiae Supporting Petitioner, at 24, n. 14, *Gade v. National Solid Wastes Management Ass'n,* 505 U.S. 88, 112 S.Ct. 2374, 120 L.Ed.2d 73 (1992); *see also* OSHA Policy Statement Concerning State and Local Fire Marshall Activities (Mar. 10, 1972); The Effect of Preemption on the State Agencies without 18(b) Plans, OSHA Directive No. CSP 01–03–004 (Mar. 13, 1981).

Finally, the DOL's position—for the reasons already discussed at length—is persuasive, and is supported by discussion of the specific considerations that led the agency to conclude that the City Statutes are laws of general applicability and not in conflict with OSHA's less onerous worker safety rules.

As the DOL's position on OSHA preemption of the City Statutes is thorough, consistent, and persuasive, it is entitled to deference under *Wyeth.*

Lacking either support from the relevant federal agency, or much in the way of authority, Plaintiff relies on a summary order from the Eleventh Circuit in a case called *Associated Builders And Contractors Florida East Coast Chapter v. Miami–Dade County, FL,* 594 F.3d 1321 (11th Cir.2010). A Florida county passed an Ordinance requiring "wind loads" for cranes. OSHA regulations generally required compliance with manufacturers' recommendations on all issues, including, presumably, wind loads. The Eleventh Circuit affirmed a district judge's finding that OSHA regulations preempted the county statute. It rejected as "unpersuasive" the argument that the Ordinance was a public safety measure:

Construction job sites are closed to the public and it is undisputed that the Ordinance's wind load standards regulate how workers use and erect tower cranes

during the course of their employment, thus directly affecting occupational safety. Furthermore, the County failed to identify a single incident in which a crane accident injured a member of the general public during a hurricane.

*Id.* at 1324.

The evidence before the Court in this case does not comport with the Eleventh Circuit's findings. In New York City, construction job sites may be closed to the public but they are not "off limits" in any meaningful sense. If a crane falls in New York City, someone is almost always there to hear it—and be hit by it. The City's high density makes it all but certain that a crane accident will never be far enough from public sidewalks or nearby buildings to lack impact on public safety. Numerous crane accidents, and their impact on members of the public and surrounding property, are detailed in the City's submissions, and are not disputed by Plaintiff.

Furthermore, the City Crane Statutes are drafted in such a way that they do not regulate cranes located at the types of building sites familiar to judges in other parts of the country-sites at some remove from the general public. The City regulations quite specifically do not apply to "cranes or derricks used in industrial or commercial plants or yards not used for the construction of the facility." *Id.* § 28-3319.3(6). Under the City Regulations, the DOB does not regulate cranes if the crane is not within a boom's length of an adjoining property line. RS 19–2, § 8.1.3; see also N.Y. City Charter § 643(3).

Thus, although both the Ordinance in *Associated Builders* and the City Statutes "directly affect[ ] occupational safety," the City Statutes are not preempted because they are laws of general applicability whose sole purpose is to protect the public from the danger of falling cranes.

### b. *Conflict preemption does not apply*

Since the Building Code provisions in this case fall within the category of State laws of general applicability, and so are saved from preemption under *Gade,* the issue becomes whether they actually conflict with the OSHA Crane Regulations. As noted, *Gade* only saves these laws to the extent they do not create an actual conflict with Federal law. 505 U.S. at 107, 112 S.Ct. 2374.

Conflict preemption can arise either when it is impossible for a regulated entity to comply with both State and Federal law, or where a State law requirement stands as an obstacle to the purposes and objectives of the Federal law. *See Pacific Gas and Elec. Co. v. State Energy Resources Conservation & Development Com'n,* 461 U.S. 190, 204, 103 S.Ct. 1713, 75 L.Ed.2d 752 (1983). Here, Plaintiff identifies no impossibility and no obstacle.

As even the *Gade* plurality acknowledges, there is no necessary conflict between two sets of safety laws, one of which requires more stringent protections than the other. Plaintiff does not identify a single instance where compliance with the ostensibly more stringent City Crane Statutes has actually conflicted with any specific worker protection provisions in the OSHA Crane Regulations. Neither does compliance with the City Statutes undermine the federal goal underlying the OSHA Regulations, since workers are doubly (if incidentally) protected by the City Statutes. Plaintiff simply relies on the existence of two sets of regulation. As discussed, that is insufficient to infer preemption when dealing with State laws of general applicability.

Plaintiff does observe that as a precondition to certification, DOB requires cranes manufactured after October 1, 2006, to comply with ANSI standards set in 2004, while the recently promulgated

OSHA Crane Regulations require only that cranes manufactured after November 8, 2010 comply with 2004 ANSI standards. *Compare* RS 19–2, § 4.1, *with* 29 C.F.R. 1926.1433. This means that cranes manufactured before November 28, 2010, need only comply with ANSI standards dating from 1968 to satisfy OSHA regulations. Plaintiff makes this observation principally in support of a Dormant Commerce Clause argument, which will be discussed in greater detail below, but also appears to suggest this difference constitutes an "actual conflict" between the City Statutes and OSHA Crane Regulations. If that were true, the majority in *Gade* would have found preemption even if the State law were on of general applicability.

■■■ However, not all regulatory differences amount to "conflicts" that require State regulation to yield to federal rules. As this Court recently observed, "state action is not ordinarily preempted just because it imposes some requirement over and above that of a federal law." *U.S. Smokeless Tobacco Mfg. Co., LLC v. City of New York*, 703 F.Supp.2d 329, 346 (S.D.N.Y.2010) (citing *California v. ARC America Corp.*, 490 U.S. 93, 105, 109 S.Ct. 1661, 104 L.Ed.2d 86 (1989)) (other citations omitted). Where, as here, it is possible for Plaintiff's members to comply with both legal requirements, simply by obeying the stricter one, it is generally assumed that Federal regulation merely sets a "floor," over which States are free to impose additional regulations. *See, e.g., Wyeth v. Levine*, 555 U.S. at 573–76, 129 S.Ct. 1187. If Congress intended to make the Federal regime exclusive, it could have enacted an express preemption provision. The fact that it failed to do so, despite

decades of overlapping State and Federal regulation of the construction industry-where the State has traditionally exercised its reserved police powers to protect public health and safety-gives rise to a particularly strong inference that a mere Federal "floor" was intended, and that the presumption against preemption applies.[5] *Id.*

Thus, we begin with the assumption that a more stringent State requirement does not necessarily conflict with a Federal requirement.

There is no evidence in this case that indicates any conflict between the relevant State and Federal standards. Plaintiff has produced no evidence showing that compliance with 2004 ANSI standards renders compliance with 1968 ANSI standards impossible. While no one bothered to put either set of standards into evidence, it seems likely that later industry standards incorporate and improve on earlier ones. Plus, for cranes built in the narrow window of 2006–2010, Plaintiff offered no evidence that any of them fail to comply with the 2004 ANSI standards, while the City has offered unrebutted testimony that no such cranes exist. The conflict, if any, is purely hypothetical.

■■■ There are, of course, circumstances where it is evident that Congress (or an agency) intended its regulation to serve as both a "floor" and a "ceiling," putting any contrary State regulation at all into conflict with the Federal purpose. In such cases, a State law that interferes with specifically chosen Federal means for attaining those purposes will be preempted.

*Geier v. American Honda* was such a case. 529 U.S. 861, 120 S.Ct. 1913, 146 L.Ed.2d 914 (2000). There, the Depart-

---

5. *Gade* does not address the actual conflict standard for laws of general applicability, having found that the Illinois statutes at issue in that case were subject to its general rule of

field preemption. In this absence of more specific guidance, the Court reverts to standard conflict preemption analysis. *See, e.g., Smokeless Tobacco*, 703 F.Supp.2d at 346.

ment of Transportation passed a regulation that required some, but not all, automobiles to have passive restraints, like airbags. The victim of a car accident sued Honda, on the theory that its 1987 vehicle should have had a passive restraint, even though the vehicle was in compliance with the Federal standard. The question was whether the state tort suit was preempted by the Federal standard.

Ordinarily, the assumption would be that in the area of public safety, the State is free to impose requirements (through tort suits) more stringent than Federal standards. But the Supreme Court found this assumption overcome by specific evidence that the Federal regulation reflected a deliberate policy decision to allow a phased in, rather than immediate, transition to universal passive restraints—an objective that would be undermined by state tort suits that effectively demanded an immediate transition. Justice Breyer explained:

> In petitioners' and the dissent's view, FMVSS 208 sets a minimum airbag standard. As far as FMVSS 208 is concerned, the more airbags, and the sooner, the better. But that was not the Secretary's view. The Department of Transportation's (DOT's) comments, which accompanied the promulgation of FMVSS 208, make clear that the standard deliberately provided the manufacturer with a range of choices among different passive restraint devices. Those choices would bring about a mix of different devices introduced gradually over time; and FMVSS 208 would thereby lower costs, overcome technical safety problems, encourage technological development, and win widespread consumer acceptance—all of which would promote FMVSS 208's safety objectives.

*Geier,* 529 U.S. at 874–75, 120 S.Ct. 1913; see also *id.* at 875–86, 120 S.Ct. 1913 (discussing evidence of agency intent in detail).

Plaintiff argues that the OSHA Crane Regulation governing design standards was intended as both a "floor and ceiling" for the regulation of crane design. However, Plaintiff has not suggested any reason why I should reach that conclusion. Plaintiff does not suggest a goal—such as gradual phase-ins, or consumer acceptance, or technological innovation—that would be frustrated by requiring compliance with the 2004 ANSI standards for cranes built after 2006, rather than requiring that compliance for cranes built after 2010 (as required by the new OSHA Crane Regulations). In short, it has done nothing to suggest an actual frustration of Federal purposes and objectives that follows from demanding compliance with stricter State requirements for crane design. There is thus no basis to take this case out of the presumption against preemption and bring it under *Geier.* Cf. *Wyeth,* 555 U.S. at 580–81, 129 S.Ct. 1187 (rejecting analogy to *Geier,* treating federal regulation as a floor).

Sealing this conclusion is the DOL's position, to which I have already deferred, that the City's regulations do not interfere with its regulatory mission. See *supra.* This is precisely the issue on which agency deference is most warranted. See *Geier,* 529 U.S. at 883–84, 120 S.Ct. 1913.

Thus, although the City crane design regulation is more strict than the Federal one, I am not persuaded that this difference creates a conflict that requires preemption.

B. *Remaining Claims*

Plaintiffs claims brought under the Commerce Clause and Due Process Clause of the Fourteenth Amendment do not warrant extended discussion.

1. *Dormant Commerce Clause (Count III)*

■■■ The Commerce Clause provides that, "Congress shall have Power ... [t]o regulate Commerce with foreign Nations, and among the several States." U.S. Const., Art. I, § 8, cl. 3. Although the Constitution does not expressly limit the power of States to regulate commerce, the Supreme Court has "long interpreted the Commerce Clause as an implicit restraint on state authority, even in the absence of a conflicting federal statute." *United Haulers Ass'n, Inc. v. Oneida–Herkimer Solid Waste Management Authority,* 550 U.S. 330, 338, 127 S.Ct. 1786, 167 L.Ed.2d 655 (2007) (citations omitted). This implicit restraint is referred to as the "Dormant" Commerce Clause. As the Supreme Court put the rule in *General Motors Corp. v. Tracy,* "The negative or dormant implication of the Commerce Clause prohibits state taxation or regulation that discriminates against or unduly burdens interstate commerce and thereby impedes free private trade in the national marketplace." 519 U.S. 278, 287, 117 S.Ct. 811, 136 L.Ed.2d 761 (1997). Its limitation is equally applicable to municipal legislation. *See, e.g., Dean Milk v. City of Madison,* 340 U.S. 349, 71 S.Ct. 295, 95 L.Ed. 329 (1951).

The parties agree that the City Statutes do not discriminate, either on their face or by their necessary effects, against interstate economic interests in favor of local business. *Town of Southold v. Town of East Hampton,* 477 F.3d 38, 48–49 (2d Cir.2007); *Selevan v. New York Thruway Authority,* 584 F.3d 82, 95 (2d Cir.2009) (finding challenged law non-discriminatory). Rather, local and out-of-state construction businesses are equally burdened by the requirements the City Statutes impose, and Plaintiff, correctly, does not argue that Statutes nonetheless have the effect of favoring local economic interests. *Town of Southold,* 477 F.3d at 48–49.

Thus, the City Statutes will be upheld against Plaintiff's Dormant Commerce Clause challenge, "unless the burden imposed on [interstate] Commerce" by the City Statutes "is clearly excessive in relation to the putative local benefits." *United Haulers,* 550 U.S. at 346, 127 S.Ct. 1786 (internal citation omitted) (plurality). The Supreme Court explained what this means in the 1970 case of *Pike v. Bruce Church,* as follows:

Where the statute regulates even-handedly to effectuate a legitimate local public interest, and its effects on interstate commerce are only incidental, it will be upheld unless the burden imposed on such commerce is clearly excessive in relation to the putative local benefits. If a legitimate local purpose is found, then the question becomes one of degree. And the extent of the burden that will be tolerated will of course depend on the nature of the local interest involved, and on whether it could be promoted as well with a lesser impact on interstate activities.

397 U.S. 137, 142, 90 S.Ct. 844, 25 L.Ed.2d 174 (1970) (internal citation omitted); *see also National Elec. Mfrs. Ass'n v. Sorrell,* 272 F.3d 104, 108–09 (2d Cir.2001); *Selevan,* 584 F.3d at 95.

The Second Circuit has held that, "For a state statute to run afoul of the *Pike* standard, the statute, at a minimum, must impose a burden on interstate commerce that is qualitatively or quantitatively different from that imposed on intrastate commerce," and that "if no such unequal burden be shown, a reviewing court need not proceed further." *National Elec.,* 272 F.3d at 109. The Second Circuit has also identified three circumstances where an "unequal burden" of the sort necessary to invoke *Pike* balancing will be found:

(1) when the regulation has a disparate impact on any nonlocal commercial entity; (2) when the statute regulates commercial activity that takes place wholly beyond the state's borders; and (3) when the challenged statute imposes a regulatory requirement inconsistent with those of other states.

*Town of Southold,* 477 F.3d at 50–51 (quoting *United Haulers Ass'n, Inc. v. Oneida–Herkimer Solid Waste Memt. Auth.,* 438 F.3d 150, 156–57 (2d Cir.2006), *affd.* 550 U.S. 330, 127 S.Ct. 1786, 167 L.Ed.2d 655 (2007)); *see also National Elec.,* 272 F.3d at 110–12 (discussing extraterritoriality and inconsistent regulatory requirements); *SPGGC, LLC v. Blumenthal,* 505 F.3d 183, 193–96 (2d Cir.2007) (same).

Here, Plaintiff invokes the *Pike* test, and argues that the burden imposed on its members by the City Statutes is clearly excessive in relation to the local benefits the Statutes provide. But Plaintiff has failed at the threshold by failing to introduce any evidence that the City Statutes "impose a burden on interstate commerce that is qualitatively or quantitatively different from that imposed on intrastate commerce," i.e., an "unequal burden." *National Elec.,* 272 F.3d at 109; *see also Freedom Holdings, Inc. v. Spitzer,* 357 F.3d 205, 218–19 (2d Cir.2004).

Plaintiff relies on the third species of "unequal burden" set forth in *Town of Southold,* arguing that the City Statutes "impose[ ] a regulatory requirement inconsistent with those of other states." 477 F.3d at 50–51. As discussed above, City regulations require, as a pre-condition to certification, that cranes made after October 1, 2006 comply with ANSI standards set in 2004. The new OSHA Crane Regulations that set the same standard apply only to cranes manufactured after November 8. *See* 29 C.F.R. § 1926.1433. Plaintiff concludes that, hypothetically, cranes made after October 1, 2006, but before November 8, 2010, that comply with ANSI standards from 1968 but not those from 2004, can be used generally throughout the country, but not in New York.

The problem is, there are no such cranes.

The City has introduced evidence that (1) no crane has ever been denied a Certificate of Approval based on its design failing to comply with the appropriate ANSI standard, and (2) every crane manufactured after 2006 does, as a matter of fact, comply with 2004 ANSI standards. *See* Ocharsky Decl. ¶ 87; Selvin Reply Decl., Exs. M, N. This evidence is undisputed. Indeed, Plaintiff expressly declined to proffer any witnesses or evidence on either point. Plaintiffs only witness, William Shuzman, expressly disclaimed personal knowledge of a crane's having been rejected based on its design under the hypothetically stricter City Statutes, and did not address the City's proof that every crane manufactured after October 1, 2006 complied with the 2004 ANSI standards. *See* Decl. of Selvan, Ex. D, pg. 50, 51.

Plaintiff also has not identified the regulations in place in other states at all, let alone how they conflict with the City Statutes. As the Second Circuit has made clear, for the purpose of a Dormant Commerce Clause challenge, "It is not enough to point to a risk of conflicting regulatory regimes in multiple states; *there must be an actual conflict* between the challenged regulation and those in place in other states." *National Elec.,* 272 F.3d at 112 (collecting cases) (emphasis added); *see also SPGGC,* 505 F.3d at 196. Here, Plaintiff has failed to offer any evidence to support the argument that the *hypothetical* conflict it has identified led to any *actual* regulatory conflict in the real world. This Court certainly will not strike down the City Statute on the basis of apparently

imaginary cranes that may or may not comply with the undisclosed laws of other States.

The City is, therefore, entitled summary judgment on Count III.

### 2. *Due Process (Counts IV and V)*

Plaintiff struggles to challenge to the City Statutes under both the procedural and substantive aspects of the Due Process Clause of the Fourteenth Amendment. Neither challenge has any merit.

#### a. *Procedural Due Process*

 In its complaint, Plaintiff alleges that the City Statutes deprive its members of procedural due process by putting unconstrained discretion in the hands of DOB inspectors, both to issue citations and stop work orders, and to pass rules without giving Plaintiff's members notice and an opportunity to be heard. However, these allegations are unsupported by any evidence.

DOB's decision to issue citations for violation of its rules can be administratively appealed to the Board of Standards and Appeals, N.Y. City Charter, § 648, and notices of violation contested before the City Environmental Control Board. N.Y. City Charter § 1049–a. If either of those tribunals does not satisfy, their determinations are subject to judicial review in a New York C.P.L.R. article 78 proceeding in New York State Supreme Court. That gives Plaintiff's members plenty of due process to challenge a summons as arbitrary or illegal.

As for DOB rule-making, the City Administrative Procedure Act ("APA") requires that all City agencies provide for public comment prior to final adoption of a rule. *See generally* N.Y. City Charter § 1043. Therefore, Plaintiff's members always should have an opportunity to be heard. Plaintiff does not identify any situation where the City violated the APA.

Thus, to the extent Plaintiff mounts a facial challenge to the City Statutes under the Due Process clause, its challenge is patently meritless.

 To the extent Plaintiff alleges that the arbitrary enforcement of these laws has led to particular violations of procedural due process for its members, its challenge also fails. Plaintiff lacks standing to pursue 42 U.S.C. § 1983 claims on behalf of its members. "It is the law of this Circuit that an organization does not have standing to assert the rights of its members in a case brought under 42 U.S.C. § 1983, as we have 'interpret[ed] the rights [§ 1983] secures to be personal to those purportedly injured.'" *Nnebe v. Daus,* 644 F.3d 147 (2d Cir.2011) (citing *League of Women Voters of Nassau Cnty. v. Nassau Cnty. Bd. of Supervisors,* 737 F.2d 155, 160 (2d Cir.1984)).

 Perhaps appreciating the difficulty of its position, Plaintiff argues, in its Opposition to the City's cross-motion, that the City Statutes are void for vagueness, and therefore violate the "notice" element of procedural due process, because they do not provide recognizable standards to the regulated community, but instead vest "unlimited discretion" in the hands of the DOB and its inspectors.

 To the extent that a facial challenge to some of the City Statutes is fairly encompassed by the first amended complaint, it fails. "A facial challenge will only succeed if there is no set of circumstances under which the challenged practices would be constitutional." *Deshawn E. by Charlotte E. v. Safir,* 156 F.3d 340, 347 (2d Cir.1998) (citing *United States v. Salerno,* 481 U.S. 739, 745, 107 S.Ct. 2095, 95 L.Ed.2d 697 (1987)). Plaintiff identifies a few statutory provisions that give the com-

missioner of the DOB power to promulgate rules to enforce the provisions of the Statutes, but there is nothing vague about those provisions; many statutes contain such clauses. Whatever rules the DOB eventually passes will be subject to the same notice and comment as its other rules; and if Plaintiff finds any rules the DOB eventually passes pursuant to the City Statutes to be unconstitutionally vague, it is free to bring a vagueness challenge then. In any event, any rulemaking under the City APA, which can be challenged via article 78, will satisfy both the requirements of notice and opportunity to be heard.

The only other laws complained of give the DOB commissioner discretion to issue temporary certificates of approval or operation for cranes and derricks. Plaintiff complains that there are no criteria specified for the issuance of such temporary certificates. However, that does not necessarily mean that the DOB has been given unconstrained discretion. Presumably, discretion would be guided by the purposes of the Building Code generally and the provisions of the City Statutes in particular. To the extent that the discretionary issuance (or withholding) of a temporary certificate of approval in question was deemed arbitrary and capricious, it could be reviewed by a court in an article 78 proceedings. Therefore, the City Statutes are not void for vagueness.

#### b. Substantive due process

■ Finally, Plaintiff's claim for a violation of substantive due process fails as well.

■ To the extent Plaintiff relies on the "arbitrary" enforcement of the Statutes in order to establish a violation of a right to substantive due process, Plaintiff "must demonstrate not only government action but also that the government action was 'so egregious, so outrageous, that it

may fairly be said to shock the contemporary conscience.' " *Pena v. DePrisco,* 432 F.3d 98, 112 (2d Cir.2005) (quoting *County of Sacramento v. Lewis,* 523 U.S. 833, 847 n. 8, 118 S.Ct. 1708, 140 L.Ed.2d 1043 (1998)). As the Second Circuit explains:

> Substantive due process is an outer limit on the legitimacy of governmental action. It does not forbid governmental actions that might fairly be deemed arbitrary or capricious and for that reason correctable in a state court lawsuit seeking review of administrative action. Substantive due process standards are violated only by conduct that is so outrageously arbitrary as to constitute a gross abuse of governmental authority.

*Natale v. Town of Ridgefield,* 170 F.3d 258, 263 (2d Cir.1999).

Plaintiff fails to offer so much as a scintilla of evidence showing government conduct that rattles, startles, or even piques the interest of the "contemporary conscience"—let alone "shocks" it. Plaintiffs opposition to the City's summary judgment motion includes no evidence about arbitrary enforcement decisions. And it is difficult to imagine what sort of DOB enforcement could surmount the extraordinarily high bar the Supreme Court set in *Lewis,* colorfully described by Justice Scalia (invoking Cole Porter) as "the *ne plus ultra,* the Napoleon Brandy, the Mahatma Gandhi, the Cellophane of subjectivity, th' ol' 'shocks-the-conscience' test." 523 U.S. at 861, 118 S.Ct. 1708 (Scalia, J., concurring in the judgment).

To the extent Plaintiff challenges the City Statutes themselves, rather than how they are enforced, it is sufficient to defeat its challenge to observe that several legitimate government interests underlie the City Statutes. *See supra,* Part A. They protect the public welfare on an issue of unique local concern. Because the City

Statutes implicate no fundamental rights, and are therefore entitled to very deferential scrutiny, they easily pass constitutional muster.

### CONCLUSION

The Secretary of Labor's motion for leave to file an amended amicus brief (ECF No. 69) is GRANTED. Plaintiff's motion for partial summary judgment as to Counts I and II of the Complaint (ECF No. 80) is DENIED. The City's cross-motion for summary judgment dismissing the complaint (ECF No. 73) is GRANTED.

The Clerk is instructed to remove the foregoing motions from the Court's list of active motions and terminate the case.